**LENNAR CORPORATION,** Lennar **Homes of Texas Land and Construction, Limited, and Lennar Homes of Texas Sales and Marketing, Limited d/b/a Village Builders, Appellants,**

v.

**GREAT AMERICAN INSURANCE COMPANY,** American Dynasty Surplus Lines Insurance Company, **Markel American Insurance Company, Gerling America Insurance Company, RLI Insurance Company,** Insurance Company of the State of Pennsylvania and Westchester Fire Insurance Company, Appellees.

No. 14–02–00860–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Feb. 23, 2006.

Substituted Concurring and Dissenting Opinion by Justice Edelman April 11, 2006.

Cynthia Hollingsworth and Kimberly Marie Phillips, Houston, for Appellants.

Greg K. Winslett, Ellen L. Van Meir, Dallas, B. Lee Ware, David S. Lynch, Houston, Appellees.

Panel consists of Justices FOWLER, EDELMAN and SEYMORE.

## SUBSTITUTE MAJORITY OPINION

CHARLES W. SEYMORE, Justice.

We overrule appellees' motions for rehearing. We withdraw our opinion dated June 2, 2005 and issue this substitute majority opinion.

This case involves an insurance coverage dispute over whether the insured homebuilders are covered under six commercial general liability ("CGL") policies for damages resulting from their application of defective stucco material to numerous homes. Appellants, Lennar Corporation, Lennar Homes of Texas Land and Construction, Limited, and Lennar Homes of Texas Sales and Marketing, Limited, d/b/a Village Builders (collectively "Lennar") are the insureds.[1] Appellees, Great American Insurance Company and American Dynasty Surplus Lines Insurance Company (collectively "American Dynasty"),[2] Gerling America Insurance Company ("Gerling"), Markel American Insurance Company ("Markel"), RLI Insurance Company ("RLI"), Insurance Company of the State of Pennsylvania ("ICSOP"), and Westchester Fire Insurance Company ("Westchester"), are the insurance carriers (collectively "the carriers"). Lennar appeals the denial of its motion for summary judgment and the grant of each carrier's motion for summary judgment on the coverage issues. Lennar also appeals the grant of American Dynasty's separate motion for summary judgment on Lennar's extra-contractual claims.

We affirm the denial of Lennar's motion for summary judgment as to all carriers. We affirm the summary judgments in favor of Gerling, RLI, ICSOP, and Westchester. We reverse and remand the summary judgment on coverage issues in favor of Great American/American Dynasty. We reverse and remand the summary judgment in favor of Markel. We affirm the summary judgment in favor of Great

---

1. Lennar Corporation is the parent of many entities. The homes were initially built by Lennar subsidiaries, Village Builders, Inc. or Houston Village Builders, Inc., which eventually merged into Lennar Homes of Texas Land & Construction, Limited, one of the parties to this case. Lennar Homes of Texas Land & Construction, Limited continued building the homes under the names "Village Builders" or "Houston Village Builders, Inc." Upon completion of a home, Lennar Homes of Texas Land & Construction, Limited transferred title to Lennar Homes of Texas Sales and Marketing, Limited, also a party to this case, which, in turn, transferred title to the homeowners. We will refer to the Lennar entities collectively as "Lennar."

2. Great American is an affiliate of American Dynasty although not a separate insurer of Lennar, so we will refer to these carriers collectively as "American Dynasty."

American/American Dynasty on Lennar's extra-contractual claims.

## I. BACKGROUND

From early 1996 through late 1999, Lennar built more than 400 homes in the Houston area with a synthetic stucco called Exterior Insulation and Finish System ("EIFS"). According to Lennar, the manufacturers of EIFS marketed it as an ideal product for wood-framed homes. However, Lennar contends it later discovered that EIFS is defectively designed such that it traps water behind it and does not allow the water to drain. Consequently, the trapped water can cause damage, such as wood rot, mold, and termite infestation, among other problems, to other parts of the home.

Through the spring of 1999, Lennar had received a few complaints from homeowners about EIFS-related problems. In the spring of 1999, the complaints increased after television programs regarding EIFS aired. According to Lennar, it initially accepted the manufacturer's position that the problems were caused by installation error and/or were typical of wood-framed homes. Therefore, Lennar addressed these complaints on an individual basis. However, by September 1999, after spending the summer responding to complaints, Lennar became convinced EIFS is a defective product.

Thereafter, Lennar removed the EIFS from all the homes and replaced it with a traditional stucco.[3] According to Lennar, it also repaired resulting water damage to the homes although the extent to which any homes sustained damage is disputed. Lennar then sought indemnification for all its replacement and repair costs from the carriers. The carriers refused to indemnify Lennar for the EIFS claims contending there is no coverage under their policies.[4]

Lennar sued the carriers requesting a declaratory judgment that they have a duty to indemnify Lennar for the EIFS claims and alleging breach of contract and violations of former article 21.55 of the Texas Insurance Code based on the carriers' refusal to indemnify. In addition, Lennar asserted extra-contractual claims against American Dynasty only. Lennar and each carrier filed a motion for summary judgment on the coverage issues. The trial court denied Lennar's motion and granted all the carriers' motions. American Dynasty also filed a motion for summary judgment on Lennar's extra-contractual claims, and the trial court granted the motion.[5]

## II. THE ISSUES AND OUR REVIEW

In its first issue, Lennar contends the trial court erred by denying Lennar's motion for summary judgment because Lennar established coverage under all the policies. Alternatively, in its second issue,

3. Of the approximately 400 homes involved, only two homeowners filed suit against Lennar.

4. Although Lennar replaced EIFS on most homes without suit being filed, for consistency, we will refer to the "EIFS claims." We note that Lennar paid cash settlements to a few homeowners; however, in most cases, Lennar paid contractors to replace EIFS and/or make repairs. Nonetheless, we will also refer to Lennar's resolution of all the claims as "settlements."

5. American Dynasty and Markel also filed counterclaims to rescind their policies alleging Lennar misrepresented that it did not use EIFS and failed to disclose the EIFS claims when it purchased the policies. Lennar, American Dynasty, and Markel moved for summary judgment on the rescission counterclaims. The trial court denied these motions for summary judgment and severed the rescission counterclaims into a separate action pending this appeal.

Lennar contends the trial court erred by granting the carriers' motions for summary judgment because there was, at least, a genuine issue of material fact on whether coverage exists under all the policies. In its third issue, Lennar contends the trial court erred by granting American Dynasty's motion for summary judgment on Lennar's extra-contractual claims. In its fourth issue, Lennar contends Texas law applies to this dispute.

Well-settled principles govern review of summary judgments in insurance coverage disputes. *See State Farm Fire & Cas. Co. v. Vaughan,* 968 S.W.2d 931, 933 (Tex. 1998) (per curiam).[6] To prevail on a traditional motion for summary judgment, the movant must establish there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Fort Worth Osteopathic Hosp., Inc. v. Reese,* 148 S.W.3d 94, 99 (Tex.2004). To prevail on a no-evidence motion for summary judgment, the movant must establish that "after adequate time for discovery, there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." TEX.R. CIV. P. 166a(i); *Reese,* 148 S.W.3d at 99. To defeat a no-evidence motion, the nonmovant must produce more than a scintilla of evidence raising a genuine issue of material fact. TEX.R. CIV. P. 166a(i); *Reese,* 148 S.W.3d at 99.[7] When, as here, a trial court's order granting summary judgment does not specify the grounds relied upon, we must affirm summary judgment if any

of the grounds are meritorious. *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex.2000). Finally, when both parties move for summary judgment and the trial court grants one motion and denies the other, we must review both parties' summary-judgment evidence, determine all issues presented, and render the judgment that the trial court should have rendered. *Id.* at 872.

Lennar filed one motion for summary judgment as to all the carriers. However, each of the six carriers filed its own motion for summary judgment and response to Lennar's motion for summary judgment. Therefore, in effect, we have six separate cross-motions for summary judgment to review on the coverage issues. However, the dispute with respect to each cross-motion follows a typical framework for insurance coverage litigation.

 Interpretation of insurance contracts is governed by the same rules as interpretation of other contracts. *Trinity Universal Ins. Co. v. Cowan,* 945 S.W.2d 819, 823 (Tex.1997); *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 133 (Tex.1994). When construing a contract, the court's primary concern is to give effect to the written expression of the parties' intent. *Forbau,* 876 S.W.2d at 133. We construe an unambiguous insurance policy as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154, 157 (Tex.2003). Further, the duty to indemnify is triggered by the actual facts establishing the insured's liability in the underlying suit. *Cowan,* 945 S.W.2d at 821.

**6.** Because the trial court resolved Lennar's request for a declaratory judgment via summary judgments, we also review denial of the request for declaratory judgment under summary judgment standards. *See Lidawi v. Progressive County Mut. Ins. Co.,* 112 S.W.3d 725, 730 (Tex.App.-Houston [14th Dist.] 2003, no pet.); TEX. CIV. PRAC. & REM.CODE ANN. § 37.010 (Vernon 1997).

**7.** Lennar filed a traditional motion for summary judgment. The carriers' motions contained both traditional and no evidence grounds. When we address the individual motions, we will note when a ground is a no-evidence ground.

■ Generally, an insured bears the initial burden to prove the claims against it fall within the scope of coverage afforded by the policy's initial "insuring agreement." *Comsys Info. Tech. Servs., Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 193 (Tex.App.-Houston [14th Dist.] 2003, pet. denied); *Evergreen Nat'l Indem. Co. v. Tan It All, Inc.*, 111 S.W.3d 669, 675 (Tex.App.-Austin 2003, no pet.). Then, the insurer bears the burden to prove an exclusion or other avoidance of coverage. *Comsys*, 130 S.W.3d at 193; *Tan It All*, 111 S.W.3d at 675; *see* Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03, 1991 Tex. Gen. Laws 939, 1046 (repealed and recodified 2003) (current version at TEX. INS.CODE ANN. § 554.002 (Vernon Supp.2005)). Lennar asserts it is entitled to coverage for the EIFS claims because it was "legally obligated to pay ... damages because of ... 'property damage' ... caused by an 'occurrence'" as required by the initial "insuring agreement" of all the policies.[8] However, all the carriers dispute that there was an "occurrence" and "property damage" as defined in the policies. Then, each carrier asserts various exclusions, conditions precedent, or other grounds to defeat coverage under its respective policy.

■ First, we will address the "occurrence" and "property damage" issues because they are common to all carriers.[9] Then, we will review the cross-motions for summary judgment as to each carrier. Finally, we will review American Dynasty's

motion for summary judgment on Lennar's extra-contractual claims.

### III. "OCCURRENCE" UNDER TEXAS LAW

■ "Occurrence" is defined in the policies as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." "Accident" is not defined in the policies. However, the Texas Supreme Court has stated that an injury is accidental if "'from the viewpoint of the insured, [it is] not the natural and probable consequence of the action or occurrence which produced the injury; or in other words, if the injury could not reasonably be anticipated by insured, or would not ordinarily follow from the action or occurrence which caused the injury.'" *See Mid–Century Ins. Co. v. Lindsey*, 997 S.W.2d 153, 155 (Tex.1999) (quoting *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549, 557 (Tex.1976)). Two factors bear on the determination of whether an insured's action constitutes an accident: (1) the insured's intent, and (2) the reasonably foreseeable effect of its conduct. *See id.*

■ Within this framework, the Texas Supreme Court has construed "accident" to include the negligent acts of the insured causing damage which is undesigned and unexpected. *Cowan*, 945 S.W.2d at 828; *Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 400 (Tex.1967). In contrast, when the action taken is an intentional tort, there is no

---

**8.** The wordings of the insuring agreements vary slightly, but they are essentially the same.

**9.** We note that one carrier, American Dynasty, argues that Florida law applies to the "occurrence" issue under its policy. American Dynasty does not urge application of Florida law to any other coverage issues. Lennar has presented a separate issue, its fourth issue, contending that Texas law ap-

plies. We must make a conflicts-of-laws decision only when the laws of the states in question differ on one or more points in issue. *Greenberg Traurig of New York, P.C. v. Moody*, 161 S.W.3d 56, 69–70 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Thus, we will first consider whether there is an "occurrence" under Texas law, then consider whether Florida law differs from Texas law.

accident, regardless of whether the results are unintended or unexpected. *Lindsey*, 997 S.W.2d at 155; *Cowan*, 945 S.W.2d at 827–28; *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635–36 (Tex. 1973); *see Harken Exploration Co. v. Sphere Drake Ins. PLC*, 261 F.3d 466, 472 (5th Cir.2001). In sum, there is an accident when an action is intentionally taken, but negligently performed, and the effect is not the intended or expected result had the action been performed non-negligently. *Harken*, 261 F.3d at 472–73 (citing *Cowan*, 945 S.W.2d at 828; *Orkin*, 416 S.W.2d at 400).

Here, Lennar contends its defective construction constitutes an "occurrence" because the uncontroverted evidence shows the resulting "property damage" was unintended and unexpected. In response, the carriers primarily contend that under Texas law, defective construction cannot constitute an "occurrence" as a matter of law. The carriers point out that any "property damage" was solely to Lennar's own work—the homes. The carriers reason that damage to an insured's own work is economic loss sounding in contract only, and a breach of contract is not an "occurrence." In an interrelated argument, they assert that a CGL policy is not meant to function as a performance bond and indemnify an insured for the costs to repair and replace its own work caused by its failure to properly perform its construction

contract.[10] The carriers also suggest Lennar's defective construction does not constitute an "occurrence" in this case.

We find that Texas law is unsettled on whether defective construction can constitute an "occurrence." We conclude that under the standard CGL policy, negligently created, or inadvertent, defective construction resulting in damage to the insured's own work which is unintended and unexpected can constitute an "occurrence." We further conclude that Lennar's defective construction constitutes an "occurrence" in this case.

**A. TEXAS LAW IS UNSETTLED ON WHETHER DEFECTIVE CONSTRUCTION RESULTING IN DAMAGE TO THE INSURED'S WORK CAN CONSTITUTE AN "OCCURRENCE."**

Several Texas appellate courts and federal courts applying Texas law have rendered seemingly conflicting decisions on whether defective construction resulting in damage to the insured's work can constitute an "occurrence" under a CGL policy.[11] We have not addressed, and the Texas Supreme Court has not resolved, this issue. In fact, based on this conflict, the Texas Supreme Court recently accepted a certified question on this issue from the Fifth Circuit. *See Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 428 F.3d 193 (5th Cir.2005).

---

10. We will discuss the carriers' arguments together because they are interrelated; in essence, the carriers argue that defective construction resulting in damage to the insured's own work is not an "occurrence." Apparently, the carriers acknowledge that defective construction can constitute an "occurrence" when it results in damage to the work of a third-party. *See generally Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720 (5th Cir.1999); *E & R Rubalcava Constr., Inc. v. The Burlington Ins. Co.*, 147 F.Supp.2d 523 (N.D.Tex.2000).

11. We have found numerous cases and articles showing there is also a conflict nationwide on this issue. *Compare, e.g.*, Clifford J. Shapiro, *Point/Counterpoint: Inadvertent Construction Defects Are An "Occurrence" Under CGL Policies*, 22–SPG–CONSTR. LAW. 13 (2002), *with* Linda B. Foster, *Point/Counterpoint: No Coverage under the CGL Policy for Standard Construction Defect Claims*, 22–SPG–CONSTR. LAW. 18 (2002).

### 1. The Carriers' Cases

The carriers cite several cases applying Texas law in support of their contention that defective construction cannot constitute an "occurrence" as a matter of law. For example, in *Hartrick v. Great American Lloyds Insurance Co.*, the court held that the insured's defective construction of a home's foundation, which resulted in structural problems and damage to the home, did not constitute an "occurrence." 62 S.W.3d 270, 276–78 (Tex.App.-Houston [1st Dist.] 2001, no pet.). The court reasoned that the insured's voluntary and intentional conduct was its breach of implied warranties by failing to properly prepare the soil and failing to construct a sufficient foundation, and the damage to the home was the reasonably foreseeable result of this conduct. *See id.* at 277; *see also Malone v. Scottsdale Ins. Co.*, 147 F.Supp.2d 623, 627–28 (S.D.Tex.2001) (finding insured builder's alleged failure to construct improvements according to plans and specifications was not an "occurrence" because the conduct was voluntary and intentional); *Devoe v. Great Am. Ins.*, 50 S.W.3d 567, 572 (Tex.App.-Austin 2001, no pet.) (finding insured's allegedly deficient construction and failure to complete a home on time was not an "occurrence" because the construction was voluntary and intentional even if the resulting, poorly constructed home was unexpected, unforeseen, or unintended).

On one hand, *Hartrick, Malone,* and *Devoe* seem somewhat limited to their facts because the insureds engaged in substandard construction practices or failed to follow architectural or engineering specifications, from which it could be inferred that they intended or expected the resulting damage. *See generally, Hartrick,* 62 S.W.3d at 276–78; *Malone,* 147 F.Supp.2d at 627–28; *Devoe,* 50 S.W.3d at 569–72. On the other hand, at least *Hartrick* and *Devoe* seem to suggest that defective construction cannot constitute an "occurrence" in general because the construction is voluntary and intentional and the resulting damage is reasonably expected even if the insured did not intend or expect the damage. *See Hartrick,* 62 S.W.3d at 277–78; *Devoe,* 50 S.W.3d at 571–72.[12]

However, the carriers also cite *Jim Johnson Homes, Inc. v. Mid–Continent Casualty Co.*, in which the court did seem to make a blanket holding that defective construction resulting in damage to the insured's work cannot constitute an "occurrence" as a matter of law. 244 F.Supp.2d 706, 714–19 (N.D.Tex.2003). In *Jim Johnson Homes,* the underlying claimants complained of numerous deficiencies by the insured during construction of their home which resulted in the insured's abandoning the project and the claimants' terminating the contract; the claimants alleged breach of contract, DTPA violations, fraud, and negligence. *Id.* at 710–12. The court held that the insurer had no duty to defend or indemnify the insured because there was no "occurrence." *Id.* at 714–19. The court reasoned that despite the negligence allegations, the gist of the claimants' complaint was breach of contract based on the insured's failure to properly perform the contract. *See id.* The court stated that the purpose of a liability policy is to protect the insured from liability for "property damage" caused by the insured's product, but not for replacement or repair of

---

**12.** However, the First Court of Appeals, which decided *Hartrick*, recently found that unintentionally defective construction *may* constitute an "occurrence." *See Archon* *Invs., Inc. v. Great Am. Lloyds Ins. Co.,* 174 S.W.3d 334, 342 (Tex. App.-Houston [1st Dist.] 2005, pet. filed).

the insured's product. *See id.* at 714–15.[13] The court further stated that a liability policy is not meant to function as a performance bond and ensure that the insured will perform its construction contract in a workmanlike manner and in accordance with the terms of the contract. *See id.* at 715.

Recently, another federal court expanded on the *Jim Johnson Homes* court's theory that an insured's defective construction resulting in damage to its work cannot constitute an "occurrence" because the claim sounds in contract only. *See Lamar Homes, Inc. v. Mid–Continent Cas. Co.,* 335 F.Supp.2d 754, 758–60 (W.D.Tex.2004), *question certified by Lamar Homes, Inc. v. Mid–Continent Cas. Co.,* 428 F.3d 193 (5th Cir.2005) (citing *Jim Johnson Homes,* 244 F.Supp.2d at 714). The court noted that the Texas Supreme Court has adopted the "economic loss" doctrine: although the acts of a party may breach duties simultaneously in tort and contract, the nature of the injury determines which duty is breached; when the only injury is economic loss to the subject of the contract, a cause of action sounds in contract alone. *Id.* at 758–59 (citing *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex.1986)). The court opined that based on the economic loss doctrine, the Texas Supreme Court would hold that a breach of contract is not an "occurrence." *See id.* at 759–60 (citing *Jim Walter Homes,* 711 S.W.2d at 618); *see also Gibson & Assoc., Inc. v. Home Ins. Co.,* 966 F.Supp. 468, 474 (N.D.Tex.1997) (same).[14]

### 2. Lennar's Cases

In contrast, several courts applying Texas law have concluded that defective construction resulting in damage to the insured's own work can constitute an "occurrence" if the resulting damage is unintended and unexpected. For example, Lennar cites *Great Am. Insurance Co. v. Calli Homes, Inc.,* in which the court found that the insured's improper construction of the claimants' home, including the improper installation of EIFS, that caused various damages to the home alleged an "occurrence." 236 F.Supp.2d 693, 695–702 (S.D.Tex.2002). The court held that claims arising from negligently created, or inadvertent, construction defects allege an "occurrence" leaving coverage to be determined by the construction-specific exclusions in the policy. *Id.* at 699–700. The court stated that the consequences of negligently created, or inadvertent, construction defects are accidental, reasoning that although the work was voluntarily and intentionally performed, it was undertaken with the intent to perform properly. *Id.*

More recently, a Texas appellate court held that an insured builder's negligence resulting in damage to its work can constitute an "occurrence." *See Gehan Homes, Ltd. v. Employers Mut. Cas. Co.,* 146 S.W.3d 833, 843 (Tex.App.-Dallas 2004, pet. filed). The court specifically disagreed with *Jim Johnson Homes* and stat-

---

**13.** In *Jim Johnson Homes,* the insured's actions could arguably be characterized as intentional, and, thus, not accidental, because the insured failed to follow plans and specifications in many respects. *See* 244 F.Supp.2d at 710–11. Nonetheless, the court seemed to generally hold that construction deficiencies resulting in damage to the insured's work cannot constitute an occurrence. *See id.* at 714–19.

**14.** Several other courts applying Texas law have found that defective construction resulting in damage to the insured's work does not constitute an "occurrence." *See, e.g., Courtland Custom Homes, Inc. v. Mid–Continent Cas. Co.,* 395 F.Supp.2d 478, 484–86 (S.D.Tex.2005); *Mid Arc, Inc. v. Mid–Continent Cas. Co.,* No. A–03–CA–242–SS, 2004 WL 1125588, at *7 (W.D. Tex. Feb 25, 2004) (not designated for publication).

ed that the relevant inquiry is not whether the insured damaged its own work, i.e. the subject of the contract, but whether the damage was unintended and unexpected. *Id.; see CU Lloyd's of Texas v. Main Street Homes,* 79 S.W.3d 687, 690–95 (Tex. App.-Austin 2002, no pet.) (finding homeowner's claim against builder for foundation defects caused by reliance on inaccurate soil survey alleged an "occurrence"); [15] *see also First Tex. Homes Inc. v. Mid–Continent Cas. Co.,* No. 3–00–CV–1048–BD, 2001 WL 238112, at *3 (N.D.Tex. Mar.7, 2001) (not designated for publication), *aff'd,* No. 01–10467, 2002 WL 334705 (5th Cir.2002) (rejecting argument that damage to insured's work cannot consti-

tute an "occurrence" because paramount consideration is whether damage was unintended and unexpected).[16] For the reasons explained below, we agree that the relevant inquiry is not whether the insured damaged its own work, i.e., whether the claim sounds in contract only, but whether the damage is unintended and unexpected.

**B. DEFECTIVE CONSTRUCTION RESULTING IN DAMAGE TO THE INSURED'S WORK CAN CONSTITUTE AN "OCCURRENCE."**

The principle that a CGL policy does not generally cover the insured's defective construction resulting in damage to its own work is commonly known as the "business risk" doctrine. *See O'Shaughnessy v.*

**15.** The carriers attempt to distinguish Lennar's cases arguing they involved the duty to defend when the claimant's allegation was negligence, whereas this case involves the duty to indemnify when the only basis for Lennar's liability is breach of contract. *See Cowan,* 945 S.W.2d at 821–22 (stating duty to defend is based on factual allegations in the pleadings, whereas duty to indemnify is based on actual facts establishing the insured's liability in the underlying suit). At one point, in the cases cited by Lennar, the courts distinguished, in part, the cases cited here by the carriers because they involved indemnification obligations after jury findings of liability for breach of contract, as opposed to general negligence allegations. *See generally Calli Homes,* 236 F.Supp.2d at 698–702; *Gehan Homes,* 146 S.W.3d at 839–43; *Main Street Homes,* 79 S.W.3d at 694–95. However, in the cases cited by Lennar, the courts also distinguished the cases cited here by the carriers because they involved intentional, as opposed to generally negligent or inadvertent, construction defects; and the courts suggested the proper focus is on *negligent v. intentional defects,* as opposed to *negligence v. breach of contract. See generally Calli Homes,* 236 F.Supp.2d at 698–702; *Gehan Homes,* 146 S.W.3d at 839–43; *Main Street Homes,* 79 S.W.3d at 692–95. As we will explain, we believe the proper focus is on *negligent v. intentional defects.* In any event, Lennar's cases negate the carriers' argument that Texas law has established defective construction can never constitute an "occurrence." *See*

*Mid Arc,* 2004 WL 1125588, at *5 (finding *Hartrick* and *Main Streets Homes* conflicting despite suggestion they are reconcilable because *Hartrick* involved the duty to indemnify whereas *Main Street Homes* involved the duty to defend).

**16.** Several other courts applying Texas law have held that defective construction resulting in damage to the insured's work can constitute an "occurrence." *See, e.g., Ins. Co. of N. Am. v. McCarthy Bros. Co.,* 123 F.Supp.2d 373, 376–77 (S.D.Tex.2000); *Archon Invs., Inc.,* 174 S.W.3d at 342; *Home Owners Mgmt. Enters., Inc. v. Mid–Continent Cas. Co.,* No. CIV. A. 304CV2061BFH, 2005 WL 2452859, at *3–6 (N.D.Tex. Oct.3, 2005); *Mid–Continent Cas. Co. v. JHP Dev., Inc.,* No. Civ. A.SA04CA–192–XR, 2005 WL 1123759, at *1–4 (W.D.Tex. Apr.21, 2005) (not designated for publication); *Luxury Living, Inc. v. Mid–Continent Cas. Co.,* No. Civ. A. H–02–3166, 2003 WL 22116202, at *13–16 (S.D.Tex. Sept.10, 2003) (not designated for publication); *see also Tealwood Constr., Inc. v. Scottsdale Ins. Co.,* No. Civ.A.3:02–CV–2159–L, 2003 WL 22790856, at *5–7 (N.D.Tex. Nov.19, 2003) (not designated for publication) (finding no "occurrence" in this case but not foreclosing possibility defective construction can constitute an "occurrence"); *Acceptance Ins. Co. v. Newport Classic Homes, Inc.,* No. Civ.A.3:99–CV–2010BC, 2001 WL 1478791, at *3–4 (N.D.Tex. Nov.19, 2001) (not designated for publication) (same).

*Smuckler Corp.,* 543 N.W.2d 99, 102–03 (Minn.App.1996), *abrogated on other grounds by Gordon v. Microsoft Corp.,* 645 N.W.2d 393 (Minn.2002); *Grinnell Mut. Reinsurance Co. v. Lynne,* 686 N.W.2d 118, 123–25 (N.D.2004); *see also* James Duffy O'Connor, *What Every Construction Lawyer Should Know About CGL Coverage For Defective Construction,* 21–WTR CONSTR. LAW 15 (2001). A passage from a New Jersey case has been cited by many courts to explain the "business risk" doctrine:

> The risk intended to be insured [by the CGL policy] is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Weedo v. Stone–E–Brick, Inc.,* 81 N.J. 233, 405 A.2d 788, 791 (N.J.1979). Therefore, this doctrine recognizes that the conse-quences of poor workmanship are generally a "business risk" to be borne by the insured as opposed to an insurable risk. *Id.* at 791–92; *see O'Shaughnessy,* 543 N.W.2d at 102–03; *Lynne,* 686 N.W.2d at 123–25; Jotham D. Pierce, Jr., *Allocating Risk Through Insurance And Surety Bonds,* 425 PLI/REAL 193, 197–98 (1998).

■ Here, the carriers generally rely on the "business risk" doctrine to argue that defective construction cannot constitute an "occurrence." However, we conclude that defective construction can constitute an "occurrence" under the standard CGL policy because (1) coverage for "business risks" is ordinarily eliminated through exclusions—not through the "occurrence" requirement in the initial "insuring agreement"; and (2) coverage for some "business risks" is *not* eliminated when the damaged work, or the work out of which the damage arose, was performed by subcontractors.

### 1. The "Insuring Agreement" and the "Business Risk" Exclusions

First, coverage for "business risks" is ordinarily eliminated through exclusions—not through the "occurrence" requirement in the initial "insuring agreement." The initial "insuring agreement" is a broad statement of coverage. *See Am. Family Mut. Ins. Co. v. Am. Girl, Inc.,* 268 Wis.2d 16, 673 N.W.2d 65, 74 (2004).[17] The "insuring agreement" contains no language categorically eliminating coverage for damage to the insured's own work, i.e. a claim sounding in contract. *See id.* at 77 n. 6. There is no tort/contract demarcation in

---

**17.** In *American Girl,* the insured contractor's faulty building site preparation, based on faulty advice from a subcontractor, caused the foundation to sink resulting in extensive damage. 673 N.W.2d at 71–72. After a thorough analysis, the Wisconsin Supreme Court concluded that the faulty construction consti-tuted an "occurrence" despite arguments by the insurers that were similar to the carriers' arguments in this case. *See id.* at 73–78. We will cite *American Girl* throughout this opinion because we agree with its analysis; as we will demonstrate, the court properly considered the entire CGL policy. *See id.*

the "insuring agreement," and "occurrence" is not defined by reference to the legal category of the claim. *Id.* at 77. Instead, "occurrence" is defined as an "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

The Texas Supreme Court has not held that a claim sounding in contract cannot constitute an accident under the initial "insuring agreement." The court has applied the economic loss doctrine to determine what damages a claimant is entitled to recover. *See Jim Walter Homes,* 711 S.W.2d at 617–18 (holding claimants not entitled to exemplary damages for defendant's failure to properly construct their home because claim sounded in contract only); *see also Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 494–95 (Tex. 1991) (holding claimant could not recover in tort when only damage resulting from defendant's breach of contract was to the subject of the contract). However, the court has not applied the economic loss doctrine to determine whether an insured's action constitutes an accident under a CGL policy; *Jim Walters Homes* and *DeLanney* did *not* involve insurance coverage. *See Jim Walter Homes,* 711 S.W.2d at 617–18; *DeLanney,* 809 S.W.2d at 494–95; *see also Am. Girl,* 673 N.W.2d at 75 (clarifying "economic loss" doctrine is a remedies principle which determines whether a loss can be recovered in tort or in contract; it does not determine coverage under an insurance policy which depends instead upon the policy language).

Rather, the court has instructed that we examine the insured's intent and the reasonably foreseeable effect of its conduct. *See Lindsey,* 997 S.W.2d at 155. Within this framework, "accident" includes an insured's negligent acts causing damage which is undesigned and unexpected. *Cowan,* 945 S.W.2d at 828; *Orkin,* 416 S.W.2d at 400. However, the court has not equated negligent acts as constituting an "accident" with negligence as a form of legal liability. *See Cowan,* 945 S.W.2d at 826–28; *Orkin,* 416 S.W.2d at 400; *see also Harken,* 261 F.3d at 472–73. Instead, the court has held that negligent acts constitute an accident to distinguish negligent acts from intentional torts. *See Cowan,* 945 S.W.2d at 826–28; *see also Harken,* 261 F.3d at 472–73. In fact, in *Jim Walters Homes,* the court recognized that one may negligently, as opposed to intentionally, breach a contract although the claimant is ultimately restricted to breach of contract remedies. *See* 711 S.W.2d at 618. Further, we consider whether the damage was unintended and unexpected—not whose work was damaged. *Lindsey,* 997 S.W.2d at 155; *Cowan,* 945 S.W.2d at 828; *Orkin,* 416 S.W.2d at 400; *see Harken,* 261 F.3d at 472–73.[18] Accordingly, the "acci-

---

**18.** Nonetheless, some courts suggest that damage to the insured's own work from failure to properly perform a construction contract is presumed to be expected while damage to the work or property of a third-party is presumed to be unexpected. *See, e.g., Burlington Ins. Co. v. Oceanic Design & Constr., Inc.,* 383 F.3d 940, 948–49 (9th Cir.2004) (applying Hawaii law); *Nabholz Constr. Corp. v. St. Paul Fire & Marine Ins. Co.,* 354 F.Supp.2d 917, 921–22 (E.D.Ark.2005); *see also Hartrick,* 62 S.W.3d at 277–78. However, we do not see how damage to the insured's own work is any more expected than damage to the work or property of a third-

party if the faulty construction was inadvertent. *See Erie Ins. Exch. v. Colony Dev. Corp.,* 136 Ohio App.3d 419, 736 N.E.2d 950, 952 n. 1 (2000) (supp. op. on rehearing) (noting the "logical basis" for distinction between damage to the insured's work and collateral property is "less than clear" because they are both caused by negligent work). Moreover, this suggestion runs afoul of the "accident" framework under Texas law. We do not examine whether the damage was expected from the improper, i.e. negligent, performance of the contract. *See Harken,* 261 F.3d at 472–73 (citing *Cowan,* 945 S.W.2d at 828;

dent" framework established by the Texas Supreme Court does not necessarily eliminate coverage for damage to the insured's own work, i.e. a claim sounding in contract.

However, the standard CGL policy contains certain "business risk" exclusions. *See Am. Girl,* 673 N.W.2d at 74; *Lynne,* 686 N.W.2d at 123. Notably, the "your work" exclusion precludes coverage for "property damage" to " 'your work' arising out of it or any part of it and included in the 'products completed operations hazard.' " [19] In short, the "your work" exclusion precludes coverage for "property damage" to the insured's work arising after a construction project is finished and in the owner's possession.[20] The policy also contains exclusions precluding coverage for "property damage" to the insured's work occurring during construction.[21]

In the cases cited here by the carriers, the courts did not consider the effect of the "business risk" exclusions on the "occurrence" analysis. *See, e.g., Lamar Homes,* 335 F.Supp.2d at 758–60; *Jim Johnson Homes,* 244 F.Supp.2d at 714–19.

Rather, *Lamar Homes* and *Jim Johnson Homes* cited *T.C. Bateson Construction Co. v. Lumbermens Mutual Casualty Co.,* in which we recited the "business risk" doctrine and stated that liability insurance is not meant to protect the insured for replacement or repair of its own work. *See Lamar Homes,* 335 F.Supp.2d at 759 (citing *T.C. Bateson Constr. Co. v. Lumbermens Mut. Cas. Co.,* 784 S.W.2d 692, 694–95 (Tex.App.-Houston [14th Dist.] 1989, writ denied)); *Jim Johnson Homes,* 244 F.Supp.2d at 714–15 (same).[22] However, we based that doctrine solely on the "business risk" exclusions, including an exclusion for damage to the insured's work in effect at that time; we did *not* address the "occurrence" requirement. *See T.C. Bateson,* 784 S.W.2d at 694–95. Further, in *T.C. Bateson,* we, in turn, cited *Weedo* when explaining the "business risk" doctrine. *See id.* at 695 (citing *Weedo,* 405 A.2d at 791). However, the *Weedo* court also did not consider the "occurrence" requirement, but, instead, based its oft-cited

---

*Orkin,* 416 S.W.2d at 400). If that were the case, there would not be liability coverage for most negligent acts because damage from a negligent act will likely be reasonably expected. In fact, proof that the actor should have reasonably anticipated the resulting injury is one aspect of the proximate cause element of a negligence claim. *See Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995). Instead, we examine whether the damage was expected if the work was performed properly, i.e. non-negligently. *See Harken,* 261 F.3d at 472–73 (citing *Cowan,* 945 S.W.2d at 828; *Orkin,* 416 S.W.2d at 400).

**19.** With certain exceptions, the "products-completed operations hazard" includes all " 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work'...."

**20.** As we will further discuss, this exclusion now contains a subcontractor exception that has modified the exclusion.

**21.** One such exclusion precludes coverage for "property damage" to "that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the property damage arises out of those operations." Another exclusion precludes coverage for "that particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it" if the "property damage" is not included in the "products-completed operations hazard."

**22.** In *Jim Johnson Homes,* the court found that the exclusions applicable to deficiencies arising during construction would preclude coverage because the project was not completed; however, the court had already concluded there was no occurrence. *See* 244 F.Supp.2d at 717–18.

"business risk" passage on the exclusions, including an exclusion for damage to the insured's work. *See* 405 A.2d at 791–93. Consequently, we disagree with the *Lamar Homes* and *Jim Johnson Homes* courts' reliance on the "business risk" doctrine as recited in *T.C. Bateson* to conclude that defective construction cannot constitute an "occurrence." *See Am. Girl,* 673 N.W.2d at 76–77 (recognizing courts have continually misapplied *Weedo* to hold that defective construction cannot constitute an occurrence resulting in some "regrettably overbroad" generalizations about CGL policies).

▇▇▇ Instead, we must read all parts of an insurance policy together to ascertain the parties' intent and give effect to all parts, so that none will be rendered superfluous or meaningless. *See King v. Dallas Fire Ins. Co.,* 85 S.W.3d 185, 192–93 (Tex. 2002); *Forbau,* 876 S.W.2d at 133; *Betco Scaffolds Co. v. Houston United Cas. Ins. Co.,* 29 S.W.3d 341, 344 (Tex.App.-Houston [14th Dist.] 2000, no pet.). In *King,* the Texas Supreme Court expressly considered an exclusion when interpreting the initial "occurrence" requirement of a CGL policy and rejected the insurer's interpretation of "occurrence" that would render the exclusion superfluous and meaningless. 85 S.W.3d at 189, 192–93; *see also Cowan,* 945 S.W.2d at 828.

Similarly, finding no "occurrence" when the insured's defective construction damages its own work would render the "business risk" exclusions, particularly the "your work" exclusion, superfluous and meaningless.

> If … losses actionable in contract are never CGL "occurrences" for purposes of the initial coverage grant, then the business risk exclusions are entirely unnecessary. The business risk exclusions eliminate coverage for liability for property damage to the insured's own work

or product—liability that is typically actionable between the parties pursuant to the terms of their contract, not in tort. If the insuring agreement never confers coverage for this type of liability as an original definitional matter, then there is no need to specifically exclude it. Why would the insurance industry exclude damage to the insured's own work or product if the damage could never be considered to have arisen from a covered "occurrence" in the first place?

*Am. Girl,* 673 N.W.2d at 78. Quite simply, coverage for "business risks" should be eliminated through the appropriately named "business risk" exclusions which, when applicable, directly address damage to the insured's own work resulting from a breach of contract. *See Am. Girl,* 673 N.W.2d at 76–78; *Erie Ins. Exch. v. Colony Dev. Corp.,* 136 Ohio App.3d 406, 736 N.E.2d 941, 947–48 (1999); *see also Lynne,* 686 N.W.2d at 123–25. Therefore, CGL policies do not generally cover contract claims arising out of the insured's defective work, but this is by operation of the "business risk" exclusions, not because a loss actionable only in contract can never be an "occurrence" under the initial "insuring agreement." *Am. Girl,* 673 N.W.2d at 76; *see Colony Dev. Corp.,* 736 N.E.2d at 947–48.

Accordingly, we agree with the cases cited by Lennar because the courts recognized that the "occurrence" requirement can encompass damage to the insured's own work, and coverage then depends upon the exclusions. *See, e.g., Calli Homes,* 236 F.Supp.2d at 699–700 (concluding negligently created or inadvertent, as opposed to intentional, construction defects are accidental leaving coverage to be determined by the construction-specific exclusions); *Gehan Homes,* 146 S.W.3d at 843 (stating that finding no "occurrence" when the damage is to the insured's own

work—the subject of the contract—would read language into the policy "that simply is not there" and render surplusage the exclusions that apply to "property damage").

## 2. The Subcontractor Exception

More significantly, coverage for some "business risks" is *not* eliminated when the damaged work, or the work out of which the damage arose, was performed by subcontractors. *See Am. Girl,* 673 N.W.2d at 82–84; *O'Shaughnessy,* 543 N.W.2d at 103–05; *Colony Devel. Corp.,* 736 N.E.2d at 948–49. Specifically, the standard "your work" exclusion now contains a subcontractor exception which provides that the exclusion "does not apply if the damaged work or the work out of which the damage arises was performed on [your] behalf by a subcontractor." [23]

It is important to understand the evolution of the subcontractor exception. In the past, the "business risk" exclusions operated collectively to preclude coverage for any damage to construction projects, including damage to the work of subcontractors, or damage arising out of the work of subcontractors. *See Am. Girl,* 673 N.W.2d at 82; *O'Shaughnessy,* 543 N.W.2d at 103; Clifford J. Shapiro, *Further Reflections–Inadvertent Construction Defects Are An "Occurrence" Under Commercial General Liability Policies,* 686 PLI/Lit 73, 82 (2003). Many contractors were unhappy with this situation because more projects were being completed using subcontractors. *See Am. Girl,* 673 N.W.2d at 82. In 1976, the insurance industry began to offer, for an additional premium, an endorsement to the CGL policy known as the

Broad Form Property Damage Endorsement ("BFPD"). *See id.;* Shapiro, 686 PLI/Lit at 82. The BFPD deleted several portions from the "business risk" exclusions and replaced them with more specific exclusions that effectively broadened coverage. *See Am. Girl,* 673 N.W.2d at 83; Shapiro, 686 PLI/Lit at 82–84. Among other changes, the BFPD narrowed the "your work" exclusion and extended coverage for "property damage" to the work of a subcontractor or "property damage" arising out of the work of a subcontractor. *See Mid–United Contractors, Inc. v. Providence Lloyds Ins. Co.,* 754 S.W.2d 824, 827 (Tex.App.-Fort Worth 1988, writ denied); *Am. Girl,* 673 N.W.2d at 82–83; Shapiro, 686 PLI/Lit at 84. In 1986, the insurance industry incorporated this aspect of the BFPD directly into the CGL policy by inserting the subcontractor exception in the "your work" exclusion. *See Am. Girl,* 673 N.W.2d at 83; *O'Shaughnessy,* 543 N.W.2d at 103–04; Shapiro, 686 PLI/Lit at 85; O'Connor, 21–WTR Constr. Law. at 16 n. 5. [24]

In *T.C. Bateson* and *Weedo,* the courts recited the "business risk" doctrine based on a "your work" exclusion in the earlier version of the CGL policy, which did not contain a subcontractor exception. *See T.C. Bateson,* 784 S.W.2d at 694–95; *Weedo,* 405 A.2d at 791. Therefore, the "business risk" doctrine as recited in *T.C. Bateson* and *Weedo* has been modified by the subcontractor exception and cannot be relied on to defeat coverage for all defective construction. *See O'Shaughnessy,* 543 N.W.2d at 103–04 (recognizing cases inter-

**23.** The exclusions for damage arising during construction do not contain a subcontractor exception.

**24.** Here, all the policies, except the ICSOP policy, contain the standard "business risk" exclusions, including the "your work" exclu-

sion and its subcontractor exception. The ICSOP contains the BFPD, and, thus, effectively includes a subcontractor exception to the "your work" exclusion. *See Mid–United Contractors,* 754 S.W.2d at 827; *see also Am. Girl,* 673 N.W.2d at 83.

preting pre–1986 CGL policy no longer apply); Shapiro, 686 PLI/Lɪᴛ at 87 (stating most courts have failed to consider the history of CGL exclusions when determining whether construction defects constitute an "occurrence").

Instead, the subcontractor exception demonstrates insurers intended to cover some defective construction resulting in damage to the insured's work. *See O'Shaughnessy*, 543 N.W.2d at 104 (stating "it would be willful and perverse ... to simply ignore" the subcontractor exception that is "an affirmative statement on the part of those who drafted the policy" and "was intended to narrow the 'business risk' doctrine"); O'Connor, 21–WTR Cᴏɴsᴛʀ. Lᴀᴡ. at 15–16 (stating "business risk" doctrine should not bar some defective construction coverage that was intended by drafters of the policy and deemed important enough for insureds to pay millions in premiums). Accordingly, finding no occurrence for defective construction resulting in damage to the insured's work would render the subcontractor exception superfluous and meaningless. *See, e.g., Am.*

*Girl,* 673 N.W.2d at 78 (recognizing subcontractor's work can give rise to "property damage" caused by an "occurrence"); *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.,* 33 Kan.App.2d 504, 104 P.3d 997, 1001–03 (2005) (finding that defective materials or workmanship which caused unintended water damage to insured's project was an "occurrence" under broad "insuring agreement" and that construing "occurrence" more narrowly would render subcontractor exception meaningless);[25] *see also* Shapiro, 686 PLI/Lɪᴛ at 85 (stating subcontractor exception demonstrates "property damage" to a construction project arising from subcontractor's work is an "occurrence").[26]

Finally, we reject the carriers' argument that allowing defective construction to constitute an "occurrence" will transform a CGL policy into a performance bond. As we will discuss, the "insuring agreement" covers "damages because of ... 'property damage' ... caused by an 'occurrence.'" Therefore, although defective construction may constitute an "occurrence," the insur-

---

**25.** *See also, e.g., Limbach Co., LLC v. Zurich Am. Ins. Co.,* 396 F.3d 358, 362–63 (4th Cir. 2005) (applying Pennsylvania law); *Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.,* 189 F.Supp.2d 1212, 1219 (D.Kan.2002); *Fejes v. Alaska Ins. Co. Inc.,* 984 P.2d 519, 522–24 (Ak.1999); *Kalchthaler v. Keller Constr. Co.,* 224 Wis.2d 387, 591 N.W.2d 169, 174–76 (Ct.App.1999).

**26.** We recognize that some jurisdictions have held the opposite, reasoning that an exception to an exclusion cannot create coverage where none otherwise exists under the initial "insuring agreement." *See, e.g., ACS Constr. Co. v. CGU,* 332 F.3d 885, 891–92 (5th Cir.2003) (applying Mississippi law); *Nabholz,* 354 F.Supp.2d at 921–23; *Amerisure, Inc. v. Wurster Constr. Co., Inc.,* 818 N.E.2d 998, 1005 (Ind.Ct.App.); *see also, e.g., Burlington Ins. Co.,* 383 F.3d at 945–53; *Union Ins. Co. v. Hottenstein,* 83 P.3d 1196, 1201–02 (Colo.Ct. App.2003); *Pursell Constr., Inc. v. Hawkeye–Sec. Ins.Co.,* 596 N.W.2d 67, 70–71 (Iowa

1999); *L–J, Inc. v. Bituminous Fire and Marine Ins. Co.,* 366 S.C. 117, 621 S.E.2d 33, 35–37 (2005). However, their reasoning is contrary to the principle that we consider the whole policy to ascertain the parties' intent and give effect to all parts, so that none will be rendered superfluous and meaningless. *See King,* 85 S.W.3d at 192–93; *Forbau,* 876 S.W.2d at 133; *Betco Scaffolds,* 29 S.W.3d at 344; *see also J.S.U.B., Inc. v. United States Fire Ins. Co.,* 906 So.2d 303, 309–10 (Fla.Dist. Ct.App.2005) (recognizing exclusion cannot create coverage but considering subcontractor exception under principle that all parts of an insurance policy must be read in harmony). Moreover, the subcontractor exception does not create coverage where none otherwise exists under the "insuring agreement." Rather, it restores coverage that originally existed under the broad "insuring agreement," but was precluded by the "your work" exclusion. *See Am. Girl,* 673 N.W.2d at 83–84.

er indemnifies the insured only for resulting "property damage" arising after the project is completed.[27] In contrast, a performance bond is broader than a CGL policy in that it guarantees "the completion of a construction contract upon the default of the general contractor." BLACK'S LAW DICTIONARY 1158 (7th ed.1999); *see Florida Bd. of Regents v. Fid. & Deposit Co. of Maryland,* 416 So.2d 30, 32 (Fla.Dist.Ct. App.1982), *rejected on other grounds by Fed. Ins. Co. v. Southwest Florida Ret. Ctr., Inc.,* 707 So.2d 1119 (Fla.1998) (stating purpose of performance bond is to ensure completion of the work upon contractor's default and insure against any losses the owner may suffer if default occurs). Therefore, a "variety of deficiencies that do not constitute 'property damage' may be covered by a performance bond, and not all deficiencies cause additional property damage." *O'Shaughnessy,* 543 N.W.2d at 105. Consequently, allowing coverage for some "property damage" resulting from defective construction does not transform a CGL policy into a performance bond and require a CGL carrier to pay anytime an insured fails to complete, or otherwise comply with, its contract.[28]

However, to the extent our holding does give a CGL policy some aspects of a performance bond, we are, nonetheless, bound by the language of the current policy. The carriers' "performance bond" rationale is a rehash of the "business risk" doctrine, which is enforced through the exclusions, when applicable. *See Colony Devel. Corp.,* 736 N.E.2d at 947 (recognizing general proposition that liability policy is not a performance bond, but rationale is not that negligent construction falls outside broad insuring agreement, but that damages are usually excluded by the standard exclusions). Therefore, the "performance bond" rationale has been modified by the subcontractor exception. As one court explained:

> [T]he [insurance] industry chose to add the [subcontractor] exception to the ["your work"] exclusion in 1986.... We realize that under our holding a general contractor who contracts out all the work to subcontractors ... can ensure complete coverage for faulty workmanship. However, it is not our holding that creates this result: it is the addition of the new language to the policy. We have not made the policy closer to a performance bond for general contractors, the insurance industry has.

*Kalchthaler v. Keller Constr. Co.,* 224 Wis.2d 387, 591 N.W.2d 169, 174 (Ct. App.1999). Consequently, we reject the carriers' attempt to circumvent the subcontractor exception by urging that a "performance bond" rationale negates an occurrence in the first place. *See Lee*

---

27. The subcontractor exception restores coverage only for property damage arising after the project is completed because only the "your work" exclusion contains the subcontractor exception, and the "your work" exclusion applies to the "products completed operations hazard."

28. For example, we would likely agree with the result in *Jim Johnson Homes* based on its recited facts although we disagree with the court's suggestion that no damage arising from defective construction can result from an occurrence. There, the claimants sought rescission of the contract and return of various amounts paid before construction was complete based on the insured contractor's abandonment of the project and failure to build according to the contract. *See Jim Johnson Homes,* 244 F.Supp.2d at 710–12. The damages sought did not result from "property damage" arising after completion of the project. Therefore, requiring indemnification by the insurer could have effectively transformed the CGL policy into a performance bond in the *Jim Johnson Homes* scenario.

*Builders,* 104 P.3d at 1003 (rejecting insurer's "performance bond" argument to negate an "occurrence" because "performance bond" rationale was based on "your work" exclusion that predated subcontractor exception).

■ In sum, reading the standard CGL policy as a whole, we hold that negligently created, or inadvertent, defective construction resulting in damage to the insured's own work that is unintended and unexpected can constitute an "occurrence." Nonetheless, the "your work" or other "business risk" exclusions may preclude coverage for the damage. However, in some instances, coverage will be restored if the damaged work, or the work out of which the damage arose, was performed by subcontractors.[29]

## C. LENNAR'S DEFECTIVE CONSTRUCTION CONSTITUTES AN "OCCURRENCE."

Although the carriers primarily contend that defective construction cannot constitute an "occurrence" as a matter of law, they also suggest that Lennar's defective construction is not an "occurrence" in this case. They assert there is no accident because Lennar voluntarily and intentionally constructed the homes with EIFS even if the resulting damage was unintend-ed and unexpected. The carriers cite *Hartrick* and *Devoe* in which the courts found there was no occurrence because the insured's construction was voluntary and intentional even if the resulting damage was unintended and unexpected. *See Hartrick,* 62 S.W.3d at 277–78 (citing *Lindsey,* 997 S.W.2d at 155); *Devoe,* 50 S.W.3d at 571–72 (citing *Maupin,* 500 S.W.2d at 633).

■ The Texas Supreme Court has stated that an injury caused by voluntary and intentional conduct is not an accident just because "the result or injury may have been unexpected, unforeseen, and unintended"; however, the court has made this statement with respect to *intentional torts. See Lindsey,* 997 S.W.2d at 155 (quoting *Maupin,* 500 S.W.2d at 635); *see also Harken,* 261 F.3d at 472. The court has explicitly rejected the suggestion that "if an actor intended to engage in the conduct that gave rise to the injury, there can be no 'accident.'" *See Lindsey,* 997 S.W.2d at 155; *Cowan,* 945 S.W.2d at 828; *see also Harken,* 261 F.3d at 472. Adopting such an approach "would render insurance coverage illusory for many of the things for which insureds commonly purchase insurance." *See Cowan,* 945 S.W.2d at 828 (providing example that there is an accident when a hunter shoots at what he

29. We must note that we question whether the rationale for adding the subcontractor exception applies here. The rationale is that the contractor can control its own performance but cannot necessarily control a subcontractor's performance. *See Fireguard Sprinkler Systems, Inc. v. Scottsdale Ins. Co.,* 864 F.2d 648, 653–54 (9th Cir.1988). Here, although subcontractors built the homes and installed the EIFS, the EIFS-related damages did not result from any faulty application by the subcontractors, but rather from the fact that EIFS is inherently defective. Lennar admits that it selected EIFS to be installed on the homes although it did not know EIFS was defective. Nevertheless, the subcontractor exception is quite broad and apparently is not limited to situations where the subcontrac-tor's fault caused the damage. Instead, it merely applies "if the damaged work *or* the work out of which the damage arises *was performed* on [Lennar's] behalf by a subcontractor." (emphasis added). In fact, except for ICSOP, none of the carriers contend the "your work" exclusion precludes coverage; presumably, they recognize it would not apply due to the exception. Although ICSOP contends its "your work" exclusion applies because there is no exception, there is no dispute here over the breadth of the subcontractor exception. Further, any uncertainty over the breadth of the subcontractor exception would be relevant to whether the "your work" exclusion applies—not whether there was an occurrence.

believes is a deer but is actually a person; although firing the gun was intentional, the harm can be characterized as accidental). Instead, there is an "occurrence" if an action is intentionally taken, but negligently performed, and the effect is not the intended or expected result had the action been performed non-negligently. *Harken,* 261 F.3d at 472–73 (citing *Cowan,* 945 S.W.2d at 828; *Orkin,* 416 S.W.2d at 400).

■ Here, the uncontroverted evidence demonstrates Lennar did not intend to build the homes with a defective product and did not intend or expect the resulting damage. Daris Horn, Lennar's Customer Care Specialist who handled the EIFS claims, averred by affidavit that when Lennar decided to use EIFS in the early 1990's, the EIFS manufacturers marketed it as an improved form of stucco that was easy to install, "low maintenance," and ideal for residential, wood-framed homes. Horn further averred that Lennar was unaware EIFS was defective while Lennar was constructing the EIFS homes; instead, Lennar first recognized EIFS was defective in September 1999, approximately the same time it stopped using EIFS. Consequently, Lennar's construction of the homes with a defective product was inadvertent or, at most, negligent because it was unaware of the defect. Further, the damage was not the intended or expected resulted had the homes been properly constructed, i.e. without a defective product. Accordingly, Lennar's defective construction constitutes an "occurrence" under Texas law.

## IV. "OCCURRENCE" UNDER FLORIDA LAW

■ American Dynasty argues that Florida law applies to the "occurrence" issue under its policy. The party asserting application of foreign law bears the burden to first show a true conflict of laws and then demonstrate which law should apply.

*Weatherly v. Deloitte & Touche,* 905 S.W.2d 642, 650 (Tex.App.-Houston [14th Dist.] 1995, writ dism'd w.o.j.), leave granted, mand. denied, 951 S.W.2d 394 (Tex. 1997). American Dynasty asserts there is a conflict between Florida and Texas law because Florida law is well-settled that defective construction cannot constitute an "occurrence." We disagree. To the extent the issue may have been settled when American Dynasty filed its brief, it has since become unsettled.

American Dynasty cites *LaMarche v. Shelby Mutual Insurance Co.,* in which the Florida Supreme Court stated that a CGL policy does not cover a insured contractor's costs to replace or repair defective workmanship and materials. 390 So.2d 325, 326–27 (Fla.1980). However, the court did not consider whether the defective workmanship was an "occurrence"; instead, the court based its holding on *Weedo* and the "business risk" exclusions in the pre–1986 policy, including an exclusion for damage to the insured's work that did not contain a subcontractor exception. *See id.* at 326–27. Nonetheless, several intermediate Florida appellate courts have cited *LaMarche* when holding that defective construction is not an "occurrence" under the current CGL policy even if the work was performed by subcontractors; these courts have reasoned that an exception to an exclusion cannot create coverage where none exists in the first place. *See, e.g., Lassiter Constr. Co. v. Am. States Ins. Co.,* 699 So.2d 768, 770 (Fla.Dist.Ct.App.1997); *Home Owners Warranty Corp. v. Hanover Ins. Co.,* 683 So.2d 527, 529–30 (Fla.Dist. Ct.App.1996).

However, recently, another intermediate Florida appellate court held that a builder's CGL policy *did* cover defective construction performed by a subcontractor. *See J.S.U.B., Inc. v. United States Fire Ins. Co.,* 906 So.2d 303, 307–11 (Fla.Dist.

Ct.App.2005). The court distinguished *La-Marche*, in part, because *LaMarche* focused on exclusions in the pre–1986 policy, including the"your work" exclusion that did not contain the subcontractor exception. *See id.* at 307–10. The *J.S.U.B.* court held that defective construction causing unintended and unexpected damage is an "accident" and mentioned that the "your work" exclusion and its subcontractor exception, would have no meaning if defective construction was not covered under the initial "insuring agreement." *See id.* at 308–11.

Consequently, the same conflict exists among Florida courts as in Texas. Therefore, American Dynasty has not shown that Florida law differs from Texas law on the "occurrence" issue, and we need not engage in a choice of law analysis.[30] Because Lennar contends in its fourth issue that Texas law applies to coverage issues under the American Dynasty policy, we sustain Lennar's fourth issue. Accordingly, because Texas law applies to the "occurrence" issue under all the policies, including the American Dynasty policy, Lennar has established an "occurrence" under all the policies.

## V. "PROPERTY DAMAGE"

Although we have held that Lennar's defective construction constitutes an "occurrence," Lennar must also establish that it paid "damages because of ... property damage" caused by the defective construction. "Property damage" is defined in the policies as "[p]hysical injury to tangible property, including all resulting loss of use of that property."[31]

Lennar contends all its costs are "damages because of ... property damage." We disagree. We distinguish between three distinct categories of damages: (A) the costs to repair water damage to the homes, which constitute "damages because of ... property damage"; (B) the costs to remove and replace EIFS as a preventative measure, which do not constitute "damages because of ... property damage"; and (C) overhead costs, inspection costs, personnel costs, and attorneys' fees, which do not constitute "damages because of ... property damage."[32]

### A. COSTS TO REPAIR WATER DAMAGE

According to the summary judgment evidence, the EIFS's entrapment of moisture caused water damage to at least some of the homes. Depending on the home, the water damage included wood rot, damage to substrate, sheathing, framing, insulation, sheetrock, wallpaper, paint, carpet, carpet padding, wooden trim, and baseboards, mold damage, and termite infestation. These damages constitute "physical injury to tangible property." *See Am. Girl*, 673 N.W.2d at 74–75 (finding insured's faulty site preparation caused "property damage" because foundation sank causing the rest of the building to

---

**30.** We decline to guess how Florida law would resolve the issue to determine whether its law conflicts with Texas law. Resolution of the issue under Florida law is appropriately left to its own courts.

**31.** "Property damage" is also defined as "[l]oss of use of tangible property that is not physically injured." Apparently, none of the homeowners claimed "loss of use" due to EIFS.

**32.** American Dynasty moved for summary judgment on these overhead costs, inspection costs, personnel costs, and attorneys' fees, as a separate ground. RLI and Markel also mention in their motions for summary judgment that there is no coverage for these costs. However, we view the issue of coverage for these costs as encompassed in the "property damage" issue raised by Lennar and all carriers because Lennar claims these costs are "damages because of ... property damage," for which it is entitled to indemnification.

buckle and crack). Consequently, Lennar's costs to repair this water damage constitute "damages because of ... property damage."[33]

Nonetheless, the carriers claim that Lennar has not satisfied the "property damage" requirement because it did not prove all the homes sustained water damage. Lennar's own evidence is somewhat conflicting on whether all homes sustained water damage.[34] In any event, we hold that Lennar's costs to repair the homes that *did* sustain water damage constitute "damages because of ... property damage."

**B. REMOVAL AND REPLACEMENT OF EIFS**

 Lennar also contends it is entitled to indemnification for its costs to remove and replace EIFS on all the homes. In contrast, the carriers contend that these costs are not covered because replacement of an initially defective product is not "property damage."

The carriers cite *North American Shipbuilding, Inc. v. Southern Marine & Aviation Underwriting, Inc.*, in which the court held that the insured shipbuilder's replace-

ment of initially defective welds did not constitute "physical loss ... or damage" as required for coverage under a builder's risk policy. 930 S.W.2d 829, 832–34 (Tex. App.-Houston [1st Dist.] 1996, no writ). The court stated that the defective welds were never in "an initial satisfactory state that was changed by some external event into an unsatisfactory state," but instead came into existence in a damaged state. *Id.* at 833–34. Although *North American Shipbuilding* involved a builder's risk policy, we agree with its reasoning at least with respect to its interpretation of "property damage" because it is consistent with the definition of "property damage" in the CGL policies, which requires "physical injury" to tangible property. *See Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 215 F.Supp.2d 1171, 1183 (D.Kan. 2002) (stating that under its plain meaning, "physical injury" in CGL policy unambiguously "connotes ... an alteration in appearance, shape, color or in other material dimension"). Here, the EIFS was not physically injured after application to the homes; the EIFS was not changed from a satisfactory state into an unsatisfactory state, or otherwise physically altered.[35]

**33.** Lennar presented evidence that it incurred other costs to repair the water damage in addition to the costs to actually repair the damaged areas. For example, on some homes, windows were broken, driveways were cracked, and landscaping was damaged to repair the water damage. We characterize these costs as "damages because of ... property damage." Further, in some cases, Lennar may have removed some EIFS to access and repair underlying water damage or determine the areas of underlying damage. We characterize these costs to remove EIFS solely to repair underlying water damage as "damages because of ... property damage."

**34.** Daris Horn averred by affidavit that "all homes at issue in this case" had wood rot and/or substrate damage. Horn also testified in her deposition that every home had some damage to either sheathing, insulation, or

framing. Therefore, this evidence suggests there was "physical injury" to every home. However, at another point, Horn testified that Lennar measured damage by the moisture level in the walls. This testimony raises the question of whether every home suffered water damage or whether some homes merely accumulated moisture which could potentially cause damage. In any event, Lennar established that at least some homes sustained water damage.

**35.** Greg Eby, a Lennar superintendent involved in replacing EIFS and repairing water damage to the homes, testified it is the "substrate and beyond," not the EIFS itself, that is damaged. Donald Klein, president of one of the Lennar entities, testified the "actual rotting of the wood or growing of the mold" is the "property damage."

Rather, the EIFS was already in an unsatisfactory state when applied to the homes because it is inherently defective. Therefore, the defective EIFS does not constitute "property damage."

Nonetheless, Lennar suggests that because all the homes sustained water damage, all its costs to fully remove and replace EIFS are "damages because of ... property damage." We disagree. Even if all the homes experienced water damage, we cannot conclude Lennar's costs to remove and replace all EIFS on the homes are "damages because of ... property damage." To the contrary, the evidence reflects that in early 2000, Lennar implemented a plan to remove EIFS and replace it with a traditional stucco on all the homes regardless of whether the EIFS had caused any damage. During the process of replacing the EIFS, Lennar repaired some water damage on at least some of the homes. Nevertheless, the evidence demonstrates Lennar's intent was to fully remove and replace the EIFS as a preventative measure because it is defective.

*Fidelity & Deposit Co.* involved the dichotomy between damages resulting from physical injury to property and costs incurred to *prevent* physical injury to property. *See* 215 F.Supp.2d at 1174–84. Fidelity issued a performance bond for the insured contractor's construction of a school. *Id.* at 1175. Fidelity completed construction of the school after the school district determined the project was defective and terminated the contractor. *Id.* Fidelity was eventually assigned all the contractor's rights against its liability insurer, who denied coverage for the damages. *Id.* at 1175–76. Fidelity argued that based on extensive damage to the project, it had to be demolished and rebuilt; therefore, Fidelity was entitled to indemnification under the contractor's liability policy for its entire costs to rebuild the project because these costs were attributable to "property damage." *Id.* at 1178.

The court acknowledged there was physical injury to the project including cracked walls, blocks, joints, floor slabs, and lintels. *Id.* at 1183. The costs to repair these problems unquestionably constituted covered "property damage." *Id.* However, there were other problems which had not resulted in "property damage" but would likely have caused damage in the future. *Id.* For instance, most of the walls had discontinuous rebar which rendered them susceptible to cracking in the future. *Id.* The court believed that Fidelity made a good business decision to demolish and rebuild the project due to the potential for extensive damage in the future. *Id.* at 1180, 1184. However, the court was not persuaded that such a decision would have been necessary to repair only the physically injured property that currently existed. *Id.* The court held that the proper measure of damages was the amount it would have cost to repair the physically injured property. *Id.* at 1184. Therefore, Fidelity's total damages had to be apportioned between its consequential costs to repair physically injured property and its costs to prevent future damage. *See id.* at 1183–84.

Similarly, here, Lennar arguably made a good business decision to remove and replace all the EIFS to prevent further damage. Nonetheless, considering the summary judgment evidence, we cannot conclude that it was necessary for Lennar to remove and replace all the EIFS in order to repair the water damage, if any, to each home. Therefore, the costs incurred by Lennar to remove and replace EIFS as a preventative measure are not "damages because of ... property damage." Accordingly, Lennar must appor-

tion the EIFS-related damages between its costs to remove and replace EIFS as a preventative measure and its costs to repair water damage to the homes.[36]

### C. OVERHEAD COSTS, INSPECTION COSTS, PERSONNEL COSTS, AND ATTORNEYS' FEES

 Lennar also seeks indemnification for various costs it incurred in addressing the EIFS claims, including overhead costs, inspection costs, personnel costs, and attorneys' fees. Lennar argues that the carriers must indemnify Lennar for these costs under the "insuring agreement" portion of the policy. Lennar cites *Missouri Terrazzo Co. v. Iowa Nat'l Mut. Ins. Co.,* in which the court held that the insured's liability policy covered a building owner's claim for diminution in value caused by damaged floors installed by the insured. 740 F.2d 647, 650 (8th Cir.1984). The court found that the diminution in value constituted "damages because of ... property damage." *See id.* Likewise, Lennar characterizes its overhead costs, inspection costs, personnel costs, and attorneys' fees as "damages because of ... property damage." We disagree.

Lennar ignores the "legally obligated to pay" language in the "insuring agreement." The "insuring agreement" provides that the carrier will pay those sums that Lennar "becomes *legally obligated to*

*pay* as damages because of ... property damage." (emphasis added). The policies do not include a definition of "legally obligated to pay." However, giving the phrase its ordinary meaning, it means an obligation imposed by law, such as an obligation to pay pursuant to a judgment, settlement, contract, or statute. *See Comsys,* 130 S.W.3d at 189 n. 3 (recognizing a judgment is not the only manner by which an insured can become legally obligated to pay because a legal obligation can also arise out of a contract, such as a settlement); *Tex. Prop. and Cas. Ins. Guar. Ass'n v. Boy Scouts of Am.,* 947 S.W.2d 682, 691 (Tex.App.-Austin 1997, no writ) (same); *see also Pa. Pulp & Paper Co. v. Nationwide Mut. Ins. Co.,* 100 S.W.3d 566, 574 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (recognizing courts give terms used in an insurance contract their ordinary and generally accepted meaning unless the policy shows the words were meant in a technical or different sense). While Lennar may have been legally obligated to pay the third-party EIFS claims by replacing EIFS, making repairs, and/or making cash payments, it was not legally obligated to incur its own overhead costs, inspection costs, personnel costs, and attorneys' fees in connection with settling the claims.[37]

**36.** Until early 2000, when Lennar decided to replace all EIFS, Lennar addressed the homes on an individual basis. The evidence is somewhat unclear as to the work performed on these homes. Horn testified Lennar made "repairs" on a few homes to areas where testing revealed high moisture content. Although Horn characterized this work as "repairs," her testimony reflects some of these "repairs" may have actually been replacement of EIFS as a preventative measure because the high moisture content might damage the homes. However, Horn also indicated Lennar repaired water damage on some homes and in some cases, removed EIFS to repair the damage. In any event, Lennar must also apportion its costs incurred

before early 2000 between its costs to repair water damage and its costs to replace EIFS as a preventative measure.

**37.** In their motions for summary judgment, several carriers argued that Lennar was not "legally obligated to pay" the EIFS claims because it settled them voluntarily without suits being filed. According to Lennar, the Residential Construction Liability Act ("RCLA") legally obligated Lennar to cure construction defects without suits being filed. *See generally* TEX. PROP.CODE ANN. §§ 27.001–.007 (Vernon 2000 & Supp.2005). On appeal, the carriers no longer argue that Lennar was not legally obligated to pay the EIFS claims. Nonetheless, even if Lennar was legally obli-

Moreover, the insuring agreement clearly refers to the *claimant's* damages that the insured becomes legally obligated to pay. For instance, in *Missouri Terrazzo,* the diminution in value was the measure of the building owner's damages resulting from the damaged floors. *See* 740 F.2d at 650. The insured paid a share of those damages pursuant to settling the claimant's suit. *See id.* at 649. In contrast, Lennar's overhead costs, inspection costs, personnel costs, and attorneys' fees are not components of the homeowners' damages. Rather, they are Lennar's own costs incurred in connection with settling the EIFS claims. Therefore, Lennar was not legally obligated to pay these costs as "damages because of ... property damage."

In sum, Lennar's costs to remove and replace EIFS as a preventative measure and its overhead costs, inspection costs, personnel costs, and attorneys' fees are not "damages because of ... property damage." Consequently, the carriers have no duty to indemnify Lennar for these costs. However, Lennar's costs to repair water damage to the homes are "damages because of ... property damage." Accordingly, there remains a genuine issue of material fact on the "property damage" issue because Lennar must apportion its damages between covered damages and non-covered damages.

Having resolved the "occurrence" and "property damage" issues common to all the carriers, we will next consider each cross-motion for summary judgment.

## VI. GERLING

Gerling is one of Lennar's primary carriers. Gerling issued a CGL policy, effective June 1, 1997 to June 1, 1999, with a

policy limit of $1 million per "occurrence" and a self-insured retention ("SIR") of $250,000 per "occurrence."

Lennar moved for summary judgment asserting that the EIFS claims are covered under the Gerling policy because they constitute "property damage" caused by an "occurrence." We have already concluded that there is no coverage for Lennar's costs to replace EIFS as a preventative measure. Therefore, because there is no coverage for a portion of Lennar's costs, the trial court properly denied Lennar's motion for summary judgment as to Gerling. However, we have determined that Lennar's costs to repair water damage constitute "property damage" caused by an "occurrence." Therefore, we will consider Gerling's other summary judgment grounds for defeating coverage. We find one ground dispositive.

■ In particular, Gerling contends that it has no duty to indemnify Lennar because Lennar cannot satisfy the SIR contained in the policy. The policy provides that its coverage limits apply only in excess of the $250,000 SIR. SIR is defined as "the limit of insurance that the insured agrees to assume responsibility for in attempting settlement and/or in payment of all claims resulting from any 'occurrence.'" In short, Lennar must satisfy a $250,000 "deductible" per "occurrence" before coverage is triggered under the Gerling policy. However, we conclude that the EIFS claim for each home constitutes a separate "occurrence," and Lennar has not incurred damages exceeding $250,000 for any one home.

### A. SEPARATE "OCCURRENCES"

■ Lennar contends that all the EIFS claims constitute one "occurrence."

---

gated to pay the EIFS claims, it was not legally obligated to incur its own costs in

connection with settling the claims.

In contrast, Gerling contends the EIFS claim for each home constitutes a separate "occurrence." Under Texas law, courts apply a "cause" analysis to determine whether a set of facts involves one or more "occurrences." *Ran–Nan, Inc. v. Gen. Accident Ins. Co. of Am.,* 252 F.3d 738, 740 (5th Cir.2001) (citing *Goose Creek Consol. I.S.D. v. Cont'l Cas. Co.,* 658 S.W.2d 338, 339 (Tex.App.-Houston [1st Dist.] 1983, no writ)). Under the "cause" analysis, the proper focus in interpreting "occurrence" under a liability policy is on the number of events that cause the injuries and give rise to the insured's liability, rather than the number of injurious effects. *See id.* (citing *H.E. Butt Grocery Co. v. Nat'l Union Fire Ins. Co.,* 150 F.3d 526, 530 (5th Cir.1998)); *Maurice Pincoffs Co. v. St. Paul Fire & Marine Ins. Co.,* 447 F.2d 204, 206 (5th Cir.1971).

For example, in *Maurice Pincoffs,* the insured imported and then sold contaminated bird seed to eight different dealers. 447 F.2d at 205. The eight dealers resold the seed to various bird owners, whose birds died as a result of the contamination. *Id.* Although the district court held that there was one "occurrence"—the contamination, the Fifth Circuit held that each of the eight sales was a separate "occurrence." *Id.* at 205–06. The court reasoned that it was not the act of contamination that subjected the insured to liability. *Id.* at 206. The insured received the seed in a contaminated state and did not itself contaminate the seed. *Id.* If the insured had destroyed the seed before sale, there would have been no "occurrence" and no resulting liability. *Id.* However, once the sale was made, the insured was liable for any resulting damage. *Id.* Therefore, each of the eight sales resulted in a new liability. *Id.;*[38] *see also H.E. Butt Grocery,* 150 F.3d at 533, 535 (finding store employee's molestation of two children at different times constituted two "occurrences" because the store was exposed to new liability for each independent act of molestation, despite insured's argument that store's negligent supervision of employee was one "occurrence"); *State Farm Lloyds, Inc. v. Williams,* 960 S.W.2d 781, 785 (Tex.App.-Dallas 1997, pet. dism'd by agr.) (holding that homeowner's shooting two people in same room constituted separate "occurrences" because the injuries resulted from two separate acts, each independently giving rise to liability).

Here, Lennar contends there was only one "occurrence" because there was only one cause of damage to the EIFS homes— EIFS's repeated and continuous entrapment of water. We disagree. Examining the number of events resulting in Lennar's liability, we conclude the EIFS claim for each home constitutes a separate "occurrence." The fact that EIFS is generally a defective product that traps water would not have resulted in Lennar's liability to each homeowner absent application of EIFS to each home. Lennar was not the designer or the manufacturer of EIFS. Rather, Lennar's liability stemmed from the fact that it built and sold homes with EIFS. Thus, Lennar's liability to a particular homeowner stemmed from the application of EIFS, and the resulting damage, if any, to his or her particular home. Further, there was not one entrapment of water that caused damage to all the

---

**38.** Lennar asserts that *Maurice Pincoffs* is a "faulty batch" case whereas in defective design cases, courts have found one "occurrence." However, *Maurice Pincoffs* did not limit its ruling to "faulty batch" cases, *see generally,* 447 F.2d 204, and Lennar cites no cases applying Texas law that have limited *Maurice Pincoffs* to "faulty batch" cases. Rather, *Maurice Pincoffs* instructs that we examine the number of events resulting in the insured's liability. *See id.* at 206.

homes. Instead, the EIFS's entrapment of water on a particular home caused the damage to that home only. Therefore, Lennar was exposed to a new and separate liability for each home on which EIFS was applied. *See Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1212–14 (2nd Cir.1995) (stating Texas law would apparently support finding that application of asbestos to numerous buildings constituted separate "occurrences" despite insured's argument that its course of manufacturing and selling asbestos products constituted one "occurrence"); *Fina, Inc. v. The Travelers Indem. Co.*, 184 F.Supp.2d 547, 549–52 (N.D.Tex.2002) (finding claims of numerous workers exposed to asbestos at three Fina facilities constituted at least three "occurrences" because it was exposure to asbestos which resulted in injuries and suit against Fina).

Lennar cites several cases from other jurisdictions purporting to show that courts have found only one "occurrence" in similar situations; however, none of these cases applied Texas law.[39] The cases cited by Lennar that *have* applied Texas law would support an argument that multiple EIFS-related damages to *one* home arose from one "occurrence"; however, they do not support Lennar's argument that the

EIFS-related damages to *all* homes arose from one "occurrence." *See Foust v. Ranger Ins. Co.*, 975 S.W.2d 329, 335 (Tex. App.-San Antonio 1998, pet. denied) (holding crop-duster's application of herbicide that damaged claimants' adjacent cotton crop constituted one "occurrence" because application was one procedure despite multiple passes and refueling stops in a span of a few hours); *Carpenter Plastering Co. v. Puritan Ins. Co.*, CIV A. No. 3–87–2435–R, 1988 WL 156829, at *1, *4 (N.D.Tex. Aug.23, 1988) (not designated for publication) (holding multiple damages to *one* building caused by defective wall panels constituted one "occurrence"). Consequently, the EIFS claim for each home constitutes a separate "occurrence."

**B. No Damages Exceeding The SIR For Any Home**

■ Because the EIFS claim for each home constitutes a separate "occurrence," Lennar must satisfy a $250,000 SIR for each home before coverage is triggered under the Gerling policy. However, the summary judgment evidence demonstrates Lennar has not paid damages exceeding $250,000 for any one home. Gerling attached to its motion for summary judgment a chart prepared by Lennar reflecting the costs it has incurred for each

---

**39.** *See, e.g., Chemstar, Inc. v. Liberty Mut. Ins. Co.*, 41 F.3d 429, 431–33 (9th Cir.1994) (holding insured's supplying of lime plaster, which ultimately caused plaster pitting in twenty-eight homes, constituted one "occurrence"); *Champion Int'l Corp. v. Cont'l Cas. Co.*, 546 F.2d 502, 504–06 (2nd Cir.1976) (holding insured's sale of defective paneling to twenty-six manufacturers of vehicles resulting in damage to 1,400 vehicles was one "occurrence"); *Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 823 F.Supp. 975, 983–84 (D.Mass.1993) (holding insured utility's use of insulation that was later banned constituted one "occurrence" although it was installed in 390 homes); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1380–87 (E.D.N.Y.1988) (holding manufacturer's numerous deliveries of Agent

Orange to the military constituted one "occurrence" despite insurer's argument that each subsequent spraying in Vietnam constituted a separate "occurrence."); *Transport Ins. Co. v. Lee Way Motor Freight, Inc.*, 487 F.Supp. 1325, 1327–31 (N.D.Tex.1980) (holding that under Oklahoma law, insured's practice of employment discrimination constituted one "occurrence" despite multiple victims of discrimination and four work locations where discrimination occurred); *Household Mfg., Inc. v. Liberty Mut. Ins. Co.*, No. 85 C 8519, 1987 WL 6611, at *4–7 (N.D.Ill. Feb.11, 1987) (not designated for publication) (holding insured's sale of defective plumbing systems which were ultimately installed in numerous homes constituted one "occurrence").

home. Lennar included a similar chart in its summary judgment evidence.[40] Both charts show only one home with costs exceeding $250,000. Gerling assumes this amount is a typographical error. While not specifically conceding this amount is an error, Lennar has not disputed Gerling's assumption. In fact, Lennar acknowledges in its brief that if Lennar must pay a $250,000 SIR per home due to multiple "occurrences," any coverage would be "completely eliminated" under the Gerling policy. Thus, Lennar effectively concedes it has not incurred costs exceeding $250,000 for any one home. Therefore, Lennar cannot satisfy the $250,000 SIR applicable to each "occurrence," and Gerling has no duty to indemnify Lennar for the EIFS claims. Accordingly, the trial court properly granted Gerling's motion for summary judgment.

## VII. RLI, ICSOP, AND WESTCHESTER

RLI, ICSOP, and Westchester each issued an umbrella liability policy.[41] As it did with all of the carriers, Lennar moved for summary judgment asserting that the EIFS claims are covered under the RLI, ICSOP and Westchester policies because the claims constitute "property damage" caused by an "occurrence." We have already concluded that there is no coverage for Lennar's costs to replace EIFS as a preventative measure. Therefore, because there is no coverage for a portion of Lennar's costs, the trial court properly denied Lennar's motion for summary judgment as

to RLI, ICSOP and Westchester. However, we have determined that Lennar's costs to repair water damage constitute "property damage" caused by an "occurrence." Accordingly, we have considered these carriers' other grounds for defeating coverage. We find one similar ground dispositive as to all these carriers, so we will discuss them together.

Specifically, these excess carriers assert that they have no duty to indemnify Lennar because Lennar has not exhausted the underlying policy limits. Each excess carrier asserts that the underlying carrier must pay its policy limits before the excess carrier has a duty to indemnify Lennar. According to Lennar, the policies do not require the underlying carrier to pay its policy limits before the excess carrier has a duty to indemnify Lennar; instead, the excess carrier has a duty to indemnify Lennar whether the underlying carrier or Lennar has paid the primary policy limits.

■ We need not decide whether RLI, ICSOP, or Westchester have a duty to indemnify Lennar as long as either the underlying carrier or Lennar has paid the primary policy limits because we have concluded that the primary policy limits will not be paid by either the underlying carrier or Lennar. Lennar must satisfy a $250,000 SIR per "occurrence" before the amounts of the underlying policy limits are triggered. As we have already determined, the EIFS claim for each home is a separate "occurrence," and Lennar has not

---

**40.** Apparently, the chart filed by Lennar was updated to include a few additional homes not included on the chart filed by Gerling.

**41.** RLI's policy, effective August 1, 1998 to June 1, 1999, has a policy limit of $25,000,000 per "occurrence" and is excess to the Gerling policy. ICSOP's policy, effective June 1, 1997 to August 1, 1998, has a policy limit of $20,000,000 per "occurrence" and is excess to the Gerling policy. West-

chester's policy, effective June 1, 1995 to June 1, 1996, has a policy limit of $5,000,000 per "occurrence." Unlike the RLI and ICSOP policies, the Westchester policy is not excess to the Gerling policy because the Westchester policy period precedes the Gerling policy period. However, the primary policy underlying the Westchester policy also had limits of $1 million per "occurrence" and a $250,000 SIR.

paid damages in excess of $250,000 for any home. Therefore, Lennar's payments will not even trigger, much less, exhaust the underlying policy limits.

In fact, Lennar acknowledges in its brief that if each EIFS claim constitutes a separate "occurrence," Lennar would "be without any insurance except as to [American Dynasty] and Markel." [42] More specifically, Lennar acknowledges that if each home constitutes a separate "occurrence," "any coverage owed to Lennar would be completely eliminated under the Westchester, ... RLI and ICSOP policies." Therefore, because Lennar effectively concedes that the underlying policy limits cannot be exhausted by either an underlying carrier or Lennar, RLI, ICSOP, and Westchester have no duty to indemnify Lennar for the EIFS claims.[43] Accordingly, the trial court properly granted RLI, ICSOP, and Westchester's motions for summary judgment.

## VIII. AMERICAN DYNASTY

American Dynasty is Lennar's other primary carrier. American Dynasty issued a CGL policy, effective June 1, 1999 to June 1, 2001, with a policy limit of $1 million per "occurrence." As it did with all carriers, Lennar moved for summary judgment asserting that it established coverage under the American Dynasty policy because the EIFS claims constitute "property damage" caused by an "occurrence." American Dynasty moved for summary judgment on the following grounds: (A) there is no

"occurrence" and no "property damage"; (B) Lennar failed to exhaust the $1 million annual aggregate SIR; (C) certain exclusions preclude coverage; (D) the "known loss" and "loss in progress" doctrines preclude coverage; and (E) Lennar failed to comply with a policy condition.

### A. "OCCURRENCE" AND "PROPERTY DAMAGE"

We have already concluded that there is no coverage for Lennar's costs to replace EIFS as a preventative measure. Therefore, because there is no coverage for a portion of Lennar's costs, the trial court properly denied Lennar's motion for summary judgment as to American Dynasty. However, we have determined that Lennar's costs to repair water damage constitute "property damage" caused by an "occurrence." Therefore, the trial court erred if it granted American Dynasty's motion for summary judgment on the ground that there was no "occurrence" and no "property damage." Accordingly, we will consider American Dynasty's other summary judgment grounds.

### B. SATISFACTION OF SIR

 American Dynasty contends it has no duty to indemnify Lennar because Lennar has not satisfied the SIR contained in the policy. The policy includes an SIR of $250,000 per "occurrence" with a $1 million annual aggregate for the SIR. Therefore, to the extent coverage otherwise exists, there is an annual $1 million

**42.** As we will later discuss, our conclusion that each home constitutes a separate occurrence is not dispositive of coverage under the American Dynasty and Markel policies because the American Dynasty policy contains an aggregate SIR, and the Markel policy is excess to the American Dynasty policy.

**43.** We note that Westchester's exhaustion ground is "no evidence," while RLI and IC-SOP's exhaustion grounds are traditional. Re-

gardless, the result is the same. With respect to the traditional motions, the summary judgment evidence shows, and Lennar effectively concedes, neither Lennar nor Gerling will exhaust the underlying policy limits. With respect to the no-evidence motion, Lennar has presented no evidence that it or Gerling will exhaust the underling policy limits, and, again, effectively concedes they cannot be exhausted.

limit on the amount that Lennar must satisfy before American Dynasty has a duty to indemnify Lennar. American Dynasty contends that Lennar has failed to exhaust the $1 million aggregate SIR. American Dynasty's summary judgment ground with respect to exhaustion of the SIR was a no-evidence ground. In response, Lennar cites evidence demonstrating it has incurred more than $5 million in repair and replacement costs. However, the portion of these costs attributable to repair of water damage, as opposed to replacement of EIFS as a preventative measure, remains to be determined. Therefore, it is premature to decide whether Lennar has exhausted the $1 million aggregate SIR. Accordingly, the trial court erred if it granted American Dynasty's motion for summary judgment on the ground that Lennar has failed to exhaust the $1 million aggregate SIR.[44]

### C. EXCLUSIONS

American Dynasty contends that its exclusions J(5), M, and N preclude coverage for the EIFS claims.

#### 1. Exclusion J(5)

■ Exclusion J(5) excludes coverage for "property damage" to:

that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf *are* performing operations, if the "property damage" arises out of those operations;

(emphasis added). American Dynasty contends that this exclusion precludes coverage because the "property damage," if any, arose out of Lennar's operations. We disagree.

Giving the exclusion its plain meaning, the use of the present tense indicates the exclusion applies only to "property damage" arising *while* Lennar is *currently* working on a project. *See Main Street Homes,* 79 S.W.3d at 696 (holding exclusion J(5) did not preclude coverage for foundation defects because petition indicated insured had completed construction and sold the homes *before* the damage resulted); *cf. Houston Bldg. Serv., Inc. v. Am. Gen. Fire & Cas. Co.,* 799 S.W.2d 308, 311 (Tex.App.-Houston [1st Dist.] 1990, writ denied) (finding exclusion J(5) precluded coverage for damage occurring *while* insured janitorial company was cleaning building because operations had not been completed); *Malone,* 147 F.Supp.2d at 628–29 (holding exclusion J(5) barred coverage for construction defects and noting, when discussing another exclusion, that insured's work could *not* be deemed completed).

American Dynasty cites no evidence that the water damage to the homes occurred while Lennar was building the homes. To the contrary, the evidence reflects that the damage began shortly after the homes were completed.[45] Therefore, exclusion J(5) does not preclude coverage for the costs to repair the water damage. Accordingly, the trial court erred if it granted

**44.** American Dynasty also asserts that each home constitutes a separate "occurrence." However, our conclusion that each home constitutes a separate "occurrence" *does not* defeat coverage under the American Dynasty policy because there is an annual $1 million limit on the amount Lennar must pay before coverage is triggered. Accordingly, the fact that Lennar has not incurred damages exceeding $250,000 for any one home does not necessarily preclude coverage under the American Dynasty policy.

**45.** Donald Klein testified that EIFS-related property damage begins within "a couple of months" after a home is completed. Mark Williams, an architect familiar with EIFS, averred by affidavit that in the Houston climate, EIFS-related property damage is likely to begin shortly after construction.

summary judgment for American Dynasty based on exclusion J(5).

### 2. Exclusion M

 Exclusion M excludes coverage for:

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

American Dynasty contends exclusion M precludes coverage for the replacement of EIFS because the EIFS was not physically injured but was, instead, replaced because it was defective. While exclusion M might arguably apply to the replacement of EIFS, it does not apply to the costs incurred by Lennar to repair physical injury—water damage—to the homes.[46] Accordingly, the trial court erred if it granted summary judgment for American Dynasty based on exclusion M.

### 3. Exclusion N

 Exclusion N, commonly known as the "sistership" exclusion, precludes coverage for:

Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:

(1) "your product";

(2) "your work"; or

(3) "impaired property";

if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

American Dynasty contends exclusion N precludes coverage for replacement of EIFS because it is inherently defective. While this exclusion might also arguably apply to replacement of EIFS as a preventative measure, it clearly does not apply to Lennar's costs to repair water damage to the homes. Accordingly, the trial court erred if it granted summary judgment for American Dynasty based on exclusion N.

### D. "Known Loss" and "Loss in Progress" Doctrines

 American Dynasty also moved for summary judgment on the ground that the "known loss" and "loss in progress" doctrines preclude coverage for the EIFS claims.[47] Generally, fortuity is an inherent requirement of all risk insurance policies. *Scottsdale Ins. Co. v. Travis*, 68 S.W.3d 72, 75 (Tex.App.-Dallas 2001, pet. denied); *see Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 501 (Tex.App.-Houston [14th Dist.] 1995, no writ). The "known loss" and "loss in progress" doctrines are components of the fortuity doctrine. *See Travis*, 68 S.W.3d at 75; *Two Pesos*, 901 S.W.2d at 501. A "known loss" is a loss the insured knew had occurred at the time it purchased the policy. *See Travis*, 68 S.W.3d at 75 (citing *Burch v. Commonwealth County Mut. Ins. Co.*, 450 S.W.2d

---

**46.** Exclusion M also applies to "property damage" to "impaired property." However, "impaired property" is defined as "tangible" property other than "your work" that cannot be used because it incorporates "your work." Here, the homes are Lennar's work; thus, the homes are not "impaired property."

**47.** Only American Dynasty and Markel raised the "known loss" and "loss in progress" doctrines because their policy periods are last in line chronologically.

838, 840–41 (Tex.1970)). A "loss in progress" occurs when the insured is, or should be, aware of an ongoing progressive loss at the time it purchased the policy. *Id.; Two Pesos*, 901 S.W.2d at 501. Insurance coverage is precluded for a "known loss" or "loss in progress." *See Travis*, 68 S.W.3d at 75; *Two Pesos*, 901 S.W.2d at 501.

American Dynasty argues that when Lennar purchased the American Dynasty policy on June 1, 1999,[48] Lennar knew the extent of the EIFS-related problems; thus, the "known loss" and "loss in progress" doctrines preclude coverage for all the EIFS claims. We conclude that the "known loss" and "loss in progress" doctrines preclude coverage for some of the EIFS claims as a matter of law. However, a genuine issue of material fact exists regarding whether the "known loss" and "loss in progress" doctrines preclude coverage for the remainder of the EIFS claims.

### 1. Claims For Which Coverage Precluded

█ American Dynasty has proved that the "known loss" and "loss in progress" doctrines preclude coverage for some of the EIFS claims as a matter of law. In particular, Lennar knew of the EIFS-related damage to a few homes as of June 1, 1999. Daris Horn testified that beginning in 1995, Lennar had repaired EIFS-related problems on several homes. Further, Lennar was still working on some of these homes in June 1999. Therefore, Lennar clearly knew of these "losses" when it purchased the American Dynasty policy. *See Travis*, 68 S.W.3d at 75; *Two Pesos*, 901 S.W.2d at 501.

Horn also testified that Lennar received additional homeowner "inquiries" in the spring of 1999. The record is not clear on whether Lennar discovered and/or repaired EIFS-related "property damage" to these homes in the spring of 1999 or merely fielded inquiries from these homeowners. To the extent that Lennar had discovered and/or repaired EIFS-related "property damage" to a home, then Lennar clearly knew of the "loss" when it purchased the American Dynasty policy.

Nonetheless, Lennar asserts that it did not know EIFS was a defective product until September 1999. Regardless, Lennar knew of some EIFS-related "losses" by June 1, 1999 although it may not have known the underlying cause of the problems or the extent of the problems. Therefore, the "known loss" and "loss in progress" doctrines preclude coverage for homes on which Lennar was aware of damage and/or had made repairs when it purchased the American Dynasty policy.[49]

### 2. Fact Issue On Remaining Claims

█ There is a genuine issue of material fact on whether the "known loss" and "loss in progress" doctrines preclude coverage for the remaining EIFS claims. The evidence is conflicting on whether Lennar should have known about the ongoing "property damage," if any, to these homes as of June 1, 1999.

American Dynasty cites evidence to establish that Lennar knew, or should have known, of the magnitude of the EIFS-related problems as of June 1, 1999. As far back as 1995, Lennar had begun repairing EIFS-related damage to a few homes. In 1997, Lennar was named as a defendant in a lawsuit alleging EIFS is a

**48.** The letter binding the American Dynasty policy was issued May 28, 1999. The policy was effective June 1, 1999. Because the time between issuance and the effective date is negligible, we will refer to June 1, 1999 as the "purchase" date.

**49.** On remand, it can be determinated which specific homes fall into this category.

defective product. During the spring of 1999, Lennar experienced an increase in homeowner "inquiries" following the television programs regarding EIFS.[50] Further, during the spring of 1999, several Lennar employees, including Horn and the Village Builders' president, were "discussing" EIFS issues, and several employees spent a total of 266 hours on EIFS issues. In May 1999, several employees, including Horn, were approved to attend an EIFS remediation seminar to take place in June 1999. This evidence strongly suggests that Lennar should have realized the magnitude of the EIFS-related problems by June 1, 1999.

On the other hand, Lennar presented evidence negating that it should have realized the magnitude of the EIFS-related problems as of June 1, 1999. According to Horn, through the spring of 1999, Lennar had received only a few EIFS complaints. However, Lennar did not suspect an inherent defect in EIFS. Instead, the EIFS manufacturers assured Lennar that any problems were due to installation error.[51] Despite the increase in homeowner inquiries in spring 1999, Lennar still thought the problems were caused by installation error. It was not until September 1999, after Lennar spent the summer responding to more complaints, that it recognized a systematic product defect that would likely involve hundreds of homes. At that time, Lennar modified its plan to address EIFS problems. Lennar decided to identify all EIFS homes and determine the

number of staff members necessary to address the claims. Lennar employees also discussed whether to notify Lennar's CGL insurers of the claims.[52]

Taking Lennar's evidence as true and resolving all doubts in its favor, see Reese, 148 S.W.3d at 99, there is a genuine issue of material fact on whether Lennar should have known when it purchased the American Dynasty policy that EIFS had damaged, or was in the process of damaging, all the homes on which it was installed. See Asbestos Claims Mgmt. Corp., 73 F.3d at 1214–15 (holding "known loss" doctrine did not bar coverage for asbestos claims, except claims for which insured had been sued, or received pre-suit demand, before policy incepted; although insured knew before policy incepted that its product risked causing diseases and had received large number of claims, it was uncertain as to prospective number of injuries and claims, likelihood of successful claims, and amount of ultimate net losses); Ins. Co. of N. Am. v. U.S. Gypsum Co., 870 F.2d 148, 151–53 (4th Cir.1989) (holding "loss in progress" doctrine did not bar coverage for damage caused by massive subsidence beneath gypsum plant after policy incepted; although other subsidence had occurred before policy incepted, it had not damaged facilities, insured' witnesses did not expect the massive subsidence, insured invested millions in plant indicating it did not expect massive subsidence, and there was no certainty subsidence was destined to occur).[53] Therefore, there is a genuine

**50.** The evidence is unclear on the number of inquiries. At one point, Horn testified Lennar had received twelve to fourteen inquiries as of June 1999. At another point, she suggested Lennar had received thirty to forty inquiries by that time. Regardless, Lennar received a number of inquiries in a short time period.

**51.** In 1996, Lennar had learned of a class action in North Carolina against certain EIFS manufacturers. When Lennar inquired about

this suit, it was told the problems were unique to North Carolina and caused by applicator error.

**52.** Ultimately, Lennar decided to contact all homeowners and voluntarily replace EIFS.

**53.** Further, that fact that Lennar did not stop using EIFS until late 1999 is evidence that Lennar did not know on June 1, 1999 that

issue of material fact on whether the "known loss" and "loss in progress" doctrines preclude coverage for all the EIFS claims. Accordingly, the trial court erred if it granted American Dynasty's motion for summary judgment based on the "known loss" and "loss in progress" doctrines.

### E. POLICY CONDITION

■ American Dynasty also moved for summary judgment on the ground that there is no coverage for certain EIFS claims because Lennar violated a policy condition. Specifically, the policy requires Lennar to promptly notify American Dynasty of any claim, suit, or "occurrence" that may result in a claim. Lennar did not notify American Dynasty of any EIFS claims until January 28, 2000. However, by that time, Lennar had already settled some of the claims. Therefore, American Dynasty contends there is no coverage for the claims Lennar settled before notifying American Dynasty.

■ In response, Lennar contends that American Dynasty failed to prove that it was prejudiced by the lack of notice. Compliance with a notice provision is a condition precedent to coverage under a policy. *Struna v. Concord Ins. Servs., Inc.*, 11 S.W.3d 355, 359 (Tex.App.-Houston [1st Dist.] 2000, no pet.). However, to enforce a condition precedent to coverage, the insurer must prove that it was prejudiced by the insured's failure to comply with the condition. *Comsys*, 130 S.W.3d at 191–92 (citing *Ins. Co. of N. Am. v. McCarthy Bros. Co.*, 123 F.Supp.2d 373, 379 (S.D.Tex.2000); *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692–94

(Tex.1994)); [54] *Struna*, 11 S.W.3d at 359. Specifically, an insurer must show it was prejudiced by the insured's failure to give the insurer notice of a claim. *See Harwell v. State Farm Mut. Auto. Ins. Co.*, 896 S.W.2d 170, 174 (Tex.1995); *Liberty Mut. Ins. Co. v. Cruz*, 883 S.W.2d 164, 165 (Tex. 1993); *Struna*, 11 S.W.3d at 359–60. Whether an insurer is prejudiced by lack of notice is generally a question of fact. *Struna*, 11 S.W.3d at 359–60. In requiring the insurer to show prejudice, Texas law recognizes that only a material breach excuses performance. *Comsys*, 130 S.W.3d at 192 (citing *McCarthy Bros.*, 123 F.Supp.2d at 379; *Hernandez*, 875 S.W.2d at 693). If the insurer is not prejudiced, the insured's breach is not material. *See id.* (citing *Hernandez*, 875 S.W.2d at 693).

American Dynasty asserts that it was prejudiced as a matter of law by Lennar's settling certain EIFS claims before notifying American Dynasty of the claims. American Dynasty cites *C.M.S. v. State Farm Lloyds*, in which the court seemed to find prejudice as a matter of law based solely on the fact that the insured settled the suit before notifying the insurer. No. Civ. A. 3:97CV3202H, 1998 WL 386160, at * 4–5 (N.D.Tex. July 7, 1998) (not designated for publication). However, that holding is contrary to Texas law.

■ Texas law does not presume prejudice from "settlement without consent" or lack of notice. *Hanson Prod. Co. v. Americas Ins. Co.*, 108 F.3d 627, 631 (5th Cir. 1997); *Comsys*, 130 S.W.3d at 192. Therefore, we reject American Dynasty's argument that it was prejudiced as a matter of

---

EIFS would damage all the homes on which it was applied.

**54.** The *Hernandez* court originally imposed the prejudice requirement with respect to enforcing a "settlement-without-consent" clause in an uninsured/underinsured motorist policy.

*See* 875 S.W.2d at 692–94. However, the requirement has been expanded to apply to other types of insurance policies. *See Comsys*, 130 S.W.3d at 192–93 (citing *McCarthy Bros.*, 123 F.Supp.2d at 379–80).

law by Lennar's settling certain EIFS claims before notifying American Dynasty. *See McCarthy Bros.,* 123 F.Supp.2d at 379–80 (rejecting insurer's suggestion it was prejudiced *per se* by insured contractor's settling owner's negligent construction suit by agreeing to make repairs before notifying insurer of the suit because insured was a sophisticated commercial entity actively attempting to limit its liability); *Comsys,* 130 S.W.3d at 192 (recognizing mere fact that the insurer owes money it does not wish to pay does not constitute prejudice as a matter of law).

Instead, American Dynasty has presented no evidence it was prejudiced by the lack of notice. *See Comsys,* 130 S.W.3d at 192 (stating insurer who failed to raise even an inference of collusion, fraud, or other connivance in the settlement agreement failed to prove prejudice from settlement without consent); *cf. Harwell,* 896 S.W.2d at 172–74 (finding insurer of deceased motorist was prejudiced by estate administrator's failure to give insurer notice of plaintiff's suit arising from auto accident; administrator, who was a secretary in plaintiff's attorney's office, appeared pro se at trial and offered no defense of deceased motorist, then notified insurer of adverse judgment one day after time to file motion for new trial or appeal had expired). Therefore, the trial court erred if it granted summary judgment on the EIFS claims Lennar settled before notifying American Dynasty.

In sum, because American Dynasty was not entitled to summary judgment on any of the grounds raised in its motion, the trial court erred in granting summary judgment in favor of American Dynasty.

## IX. MARKEL

Markel issued a commercial umbrella liability policy, effective June 1, 1999 to June 1, 2001 with a policy limit of $25,000,000 per "occurrence." The Markel policy is excess to the American Dynasty policy.

As it did with all the carriers, Lennar moved for summary judgment asserting there is coverage under the Markel policy because the EIFS claims constitute "property damage" caused by an "occurrence." Markel asserted several summary judgment grounds: (A) there is no "occurrence" and no "property damage"; (B) several exclusions preclude coverage; (C) the "known loss" and "loss in progress" doctrines preclude coverage; (D) Lennar failed to comply with certain policy conditions; and (E) the EIFS claim for each home constitutes a separate "occurrence," the underlying SIR has not been exhausted, and/or the underlying policy limits have not been exhausted.

### A. "OCCURRENCE" AND "PROPERTY DAMAGE"

We have already concluded that there is no coverage for Lennar's costs to replace EIFS as a preventative measure. Therefore, because there is no coverage for a portion of Lennar's costs, the trial court properly denied Lennar's motion for summary judgment as to Markel. However, we have determined that Lennar's costs to repair water damage constitute "property damage" caused by an "occurrence." Therefore, the trial court erred if it granted Markel's motion for summary judgment on the ground that there was no "occurrence" and no "property damage." Accordingly, we will consider Markel's other grounds for defeating coverage.

### B. EXCLUSIONS

Markel contends that its Endorsement 2, Exclusion B(2), Exclusion B(10), and Exclusion B(6)(e) preclude coverage for the EIFS claims.

#### 1. Endorsement 2

■ Endorsement 2 precludes coverage for "property damage" to "[p]roperty . . . occupied by, used by, or owned by any Insured." According to Markel, this endorsement precludes coverage for the EIFS claims because at one time, Lennar occupied, used, and owned the property upon which the EIFS homes were built. We disagree.

Considering the plain meaning of Endorsement 2, it applies only to damage arising *while* the property is occupied, used, or owned by Lennar. This exclusion has been interpreted to preclude coverage for damage limited exclusively to the insured's property. *See Am. States Ins. Co. v. Hanson Indus.*, 873 F.Supp. 17, 24 (S.D.Tex.1995). The exclusion ensures that liability insurance provides compensation for damages to property not owned or controlled by the insured. *See id.; see also State Farm Fire & Cas. Co. v. English Cove Ass'n, Inc.*, 121 Wash.App. 358, 88 P.3d 986, 992 (2004) (stating "owned property" exclusion prevents a liability policy from providing first-party benefits to the insured).

■ Nonetheless, Markel refers us to another exclusion, B(6)(a), in its policy. Although Markel does not rely on Exclusion B(6)(a) to defeat coverage, Markel urges that exclusion B(6)(a) supports its interpretation of Endorsement 2. Exclusion B(6)(a) excludes coverage for damage to "property you own, rent, or occupy." According to Markel, because Exclusion B(6)(a) is in the present tense, then Endorsement 2 must refer to the past tense. Specifically, Markel stresses that the words "leased, occupied, or owned" in Endorsement 2 refer to the past tense; thus, Endorsement 2 applies to damage to property that was *ever* occupied, used, or owned by Lennar.

Despite Exclusion B(6)(a), we read Endorsement 2 in the present tense. Clearly, the words "occupied by, used by, or owned by," instead of "occupy, use, or own," are included because Endorsement 2 is in the passive voice—not because Endorsement 2 refers to the past tense. Further, Endorsement 2 is entitled "Care, Custody, and Control Exclusion." This title indicates Endorsement 2 excludes coverage for damage arising while the property is in Lennar's "care, custody, and control"—not damage to property that was ever in Lennar's "care, custody, and control."

Finally, Markel cites two cases in which courts held that coverage was precluded by the "owned or leased property" exclusions although the insureds no longer owned or leased the property. *See Dryden Oil Co. of New England, Inc. v. Travelers Indem. Co.*, 91 F.3d 278, 284 (1st Cir.1996); *Morrone v. Harleysville Mut. Ins. Co.*, 283 N.J.Super. 411, 662 A.2d 562, 565 (Ct.App.Div.1995). However, these cases are inapplicable because the damage occurred *while* the insureds owned or leased the property although the insureds no longer owned or leased the property when the claims were made. *See Dryden Oil*, 91 F.3d at 280–81, 284; *Morrone*, 662 A.2d at 565. In contrast, here, Markel cites no evidence that "property damage" to the EIFS homes arose while they were still occupied, used, or owned by Lennar. Accordingly, the trial court erred if it granted summary judgment for Markel based on Endorsement 2.

### 2. Exclusion B(2)

■ With certain exceptions, Exclusion B(2) excludes coverage for " 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." Markel contends Lennar's voluntary agreements to repair the EIFS homes constitute contracts under which Lennar

assumed liability. However, this exclusion is inapplicable here.

Exclusion B(2) precludes coverage when the insured contractually assumes liability for the conduct of a *third party* such as through an indemnity or hold harmless agreement. *See Federated Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720, 726 (5th Cir.1999); *McCarthy Bros.*, 123 F.Supp.2d at 377–78; *see also Am. Girl*, 673 N.W.2d at 80–81; *Olympic, Inc. v. Providence Wash. Ins. Co.*, 648 P.2d 1008, 1010–11 (Ak.1982). Lennar's settlement of the EIFS claims was not contractual assumption of a third party's liability, but rather resulted from Lennar's own conduct. *See McCarthy Bros.*, 123 F.Supp.2d at 377–78 (holding that "assumption of liability" exclusion did not preclude coverage for insured builder's agreement through settlement to repair damage caused by its faulty construction because insured accepted liability for its own conduct—not liability of a third party). Accordingly, the trial court erred if it granted summary judgment for Markel based on Exclusion B(2).

### 3. Exclusion B(10)

Exclusion B(10) is Markel's "sistership" exclusion. It is virtually identical to American Dynasty's sistership exclusion. We have already concluded that the sistership exclusion does not apply to Lennar's costs to repair water damage. Accordingly, the trial court erred if it granted summary judgment for Markel based on Exclusion B(10).

### 4. Exclusion B(6)(e)

Markel's Exclusion B(6)(e) is virtually identical to American Dynasty's exclusion J(5). Exclusion B(6)(e) precludes coverage for "property damage" to "[t]hat particular part of real property on which you or a contractor or subcontractor working directly or indirectly for you are performing operations, if the 'property damage' is due to those operations." We have already rejected application of this exclusion. Accordingly, the trial court erred if it granted summary judgment for Markel based on Exclusion B(6)(e).

### C. "KNOWN LOSS" AND "LOSS IN PROGRESS" DOCTRINES

Markel also contends that the "known loss" and "loss in progress" doctrines preclude coverage for the EIFS claims. Our analysis is similar to the "known loss" and "loss in progress" analysis under the American Dynasty policy. However, we evaluate Markel's "known loss" and "loss in progress" defenses using a different date because Markel's policy was purchased on July 21, 1999—almost two months after the American Dynasty policy.[55] Again, we conclude that the "known loss" and "loss in progress" doctrines preclude coverage for some of the EIFS claims as a matter of law. However, a genuine issue of material fact exists on whether the "known loss" and "loss in progress" doctrines preclude coverage for the remainder of the EIFS claims.

### 1. Claims For Which Coverage Precluded

Markel has proved that the "known loss" and "loss in progress" doctrines preclude coverage for some of the EIFS

---

**55.** Although the Markel policy was not issued until July 21, 1999, it was effective June 1, 1999. Nonetheless, we will consider July 21, 1999 as the purchase date for purposes of the "known loss" and "loss in progress" doctrines. *See Burch*, 450 S.W.2d at 841 (recog-nizing recovery may be had on a policy antedated to include the time at which the loss occurred as long as the insured and the insurer did not know of the loss *when the contract was made* ).

claims. Markel also relied on Daris Horn's deposition in support of its motion for summary judgment. Her testimony established that Lennar knew of the EIFS-related damage to a few of the homes as of July 21, 1999 because it had repaired, or was in the process of repairing, these homes. Thus, Lennar clearly knew of these "losses" when it purchased the Markel policy.

Further, Horn's testimony established that Lennar had received further "inquiries" by July 21, 1999. Again, it is not clear whether Lennar had discovered and/or repaired EIFS-related "property damage" to some or all of these homes by July 21, 1999 or merely fielded inquiries from these homeowners. To the extent that Lennar had discovered and/or repaired EIFS-related "property damage" to a home by July 21, 1999, then Lennar clearly knew of the "loss" when it purchased the Markel policy. Therefore, the "known loss" and "loss in progress" doctrines preclude coverage for homes on which Lennar was aware of and/or had repaired EIFS-related "property damage" when it purchased the Markel policy.[56]

## 2. Fact Issue On The Remaining Claims

■■■ There is a genuine issue of material fact on whether the "known loss" and "loss in progress" doctrines preclude coverage for the remainder of the EIFS claims. The evidence is conflicting on whether Lennar should have known of the ongoing "property damage," if any, to these homes as of July 21, 1999. Markel cites the same evidence cited by American Dynasty to argue that Lennar should have

known of the magnitude of the EIFS-related problems by July 21, 1999. However, Markel cites some additional evidence because its policy was purchased later.

In particular, by July 21, 1999, Horn and other Lennar employees had actually attended the EIFS remediation seminar for which they were previously approved. Further, by July 21, 1999, Lennar had formulated a plan to address EIFS complaints. In addition, Lennar spent the summer of 1999 responding to EIFS claims, so presumably Lennar was becoming increasingly aware of EIFS's potential to cause damage by July 21, 1999. This evidence strongly suggests Lennar should have realized the magnitude of the EIFS problems by that date.[57]

On the other hand, Lennar presented evidence negating that it should have realized the magnitude of the EIFS problems by July 12, 1999. Although Lennar had formulated a plan to address EIFS complaints by that date, the plan was to address the complaints on an individual basis as they were received. Thus, this plan raises the inference that Lennar had not yet decided that all EIFS homes had experienced damage and must be addressed regardless of whether the homeowner made a complaint. Again, Lennar averred that it did not know until September 1999 that EIFS was defective and would likely damage hundreds of homes.

Taking Lennar's evidence as true and resolving all doubts in its favor, there is a genuine issue of material fact on whether Lennar should have known when it purchased the Markel policy that EIFS had

---

**56.** Again, it can be determined on remand which homes fall into this category.

**57.** Markel also points to Lennar's privilege logs on which Lennar listed several reports, letters, and memoranda demonstrating that Lennar was internally communicating about

EIFS homes before July 21, 1999. However, without knowing the contents of these communications, we cannot conclude they prove Markel's "known loss" and "loss in progress" defenses.

damaged, or was in the process of damaging, all homes on which it was installed. *See Asbestos Claims Mgmt.*, 73 F.3d at 1214–15; *U.S. Gypsum*, 870 F.2d at 151–53. Consequently, there is a genuine issue of material fact on whether the "known loss" and "loss in progress" doctrines preclude coverage for all the EIFS claims. Accordingly, the trial court erred if it granted Markel's motion for summary judgment based on the "known loss" and "loss in progress" doctrines.

**D. POLICY CONDITIONS**

■ Markel further contends that coverage for the EIFS claims is precluded because Lennar violated condition E of the policy. Condition E provides that Lennar must notify Markel of any claim, suit, or occurrence that may result in a claim or suit. Condition E also provides that Lennar shall not, except at its own cost, voluntarily make any payment, assume any obligation, or incur any expense without Markel's consent. Markel contends that Lennar violated these conditions by failing to timely give Markel notice of the EIFS claims and by voluntarily settling the claims without Markel's consent.[58] However, Markel has not established that it was prejudiced by Lennar's violating these conditions. *See Hanson Prod.*, 108 F.3d at 631; *McCarthy Bros.*, 123 F.Supp.2d at 379; *Hernandez*, 875 S.W.2d at 692–94; *Comsys*, 130 S.W.3d at 191–92.

With respect to Lennar's late notice, Markel offered only one reason that it was prejudiced in its motion for summary judgment: "Lennar's inability to parse its damages any finer than rough allocations for inspection and repair, and accompanying administrative and legal costs." Markel does not elaborate on how this difficulty constitutes prejudice. Nonetheless, we cannot conclude that any difficulty Lennar may have in proving the exact amount of various components of its costs has prejudiced Markel as a matter of law. At the least, whether any such difficulty has prejudiced Markel is a question of fact. With respect to Lennar's settlement without consent, Markel presented no evidence that it was prejudiced in its motion for summary judgment. Accordingly, the trial court erred if it granted summary judgment for Markel based on Lennar's violation of policy conditions.

**E. SEPARATE OCCURRENCES/EXHAUSTION OF UNDERLYING SIR OR POLICY LIMITS**

Finally, Markel asserts it was entitled to summary judgment because each home constitutes a separate "occurrence," Lennar has not exhausted the underlying SIR, and/or Lennar has not exhausted the underlying policy limits. Markel's argument is unclear because it makes several different arguments in its brief and motion for summary judgment.

In its brief, Markel adopts Gerling's argument that each home is a separate "occurrence," and "There Is No Coverage Because All Of The Settlements Are Within The Policy's [SIR] Of $250,000 Per Occurrence." However, Markel's policy is excess to the American Dynasty policy—not the Gerling policy. Therefore, Markel's argument that none of the settlements exceeds the Gerling $250,000 SIR is inapplicable.

■ Further, Markel's argument in its brief is different than the grounds raised in its motion for summary judgment. When outlining its summary judgment grounds at the beginning of its motion, Markel acknowledges that the underlying policy is the American Dynasty policy.

---

**58.** Lennar did not notify Markel of the EIFS claims until January 28, 2000. It is undisputed that Lennar had settled some of the claims by this date. Further, it is undisputed that Markel did not consent to any of the EIFS settlements.

Markel states that coverage under the Markel policy has not been triggered because the American Dynasty $250,000 SIR has not been properly exhausted. However, as we have explained, there is an annual $1 million aggregate SIR under the American Dynasty policy. Therefore, Markel's argument that the American Dynasty $250,000 SIR has not been exhausted does not necessarily preclude coverage under the Markel policy. Instead, as we have explained, it is premature to determine whether Lennar has exhausted the $1 million aggregate SIR, and thus, whether Lennar will trigger the American Dynasty policy, or ultimately, the Markel policy.

▮ Finally, in the body of its summary judgment motion, Markel seems to make a different argument. Instead of referring to the American Dynasty SIR, Markel asserts that the underlying American Dynasty policy limits have not been exhausted, and, thus, the Markel policy has not been triggered. Again, it is premature to determine whether Lennar has exhausted the American Dynasty policy limits, and thus, whether Lennar will trigger the Markel policy.

In sum, because Markel was not entitled to summary judgment on any of the grounds raised in its motion, the trial court erred by granting summary judgment in favor of Markel.

## X. AMERICAN DYNASTY'S MOTION FOR SUMMARY JUDGMENT ON LENNAR'S EXTRA-CONTRACTUAL CLAIMS

In a separate motion, American Dynasty moved for summary judgment on Lennar's extra-contractual claims. Lennar pleaded three extra-contractual claims: (A) common-law negligent misrepresentation; (B) violations of former article 21.21 of the Texas Insurance Code; and (C) violations of former article 21.55 of the Texas Insurance Code.[59]

### A. COMMON-LAW NEGLIGENT MISREPRESENTATION

▮ The elements of a negligent misrepresentation claim are as follows: (1) the defendant made a representation in the course of its business, or in a transaction in which it had a pecuniary interest; (2) the defendant supplied false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Roof Sys., Inc. v. Johns Manville Corp.,* 130 S.W.3d 430, 438 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (citing *Fed. Land Bank Ass'n v. Sloane,* 825 S.W.2d 439, 442 (Tex.1991)).

American Dynasty moved for summary judgment on no-evidence grounds as to Lennar's negligent misrepresentation claim. In response, Lennar alleged that American Dynasty made (1) misrepresen-

---

59. American Dynasty also asserts that Florida law applies to Lennar's extra-contractual claims. However, American Dynasty has not met its burden to show that Florida law differs from Texas law on all Lennar's extra-contractual claims. *See Weatherly,* 905 S.W.2d at 650. For instance, American Dynasty has not cited Florida law to show that it differs from Texas law on Lennar's common-law negligent misrepresentation claim. Therefore, we need not engage in a choice of law analysis on that claim and will apply Texas law. However, Florida law necessarily differs from Texas law on Lennar's statutory extra-contractual claims because Lennar asserts violations of the Texas Insurance Code. Nonetheless, because we ultimately conclude that the trial court properly granted summary judgment on Lennar's claims under the Texas Insurance Code, we will evaluate those claims.

tations during the underwriting process, and (2) misrepresentations regarding its reasons for terminating, and seeking to rescind, the policy.

## 1. Misrepresentations During Underwriting Process

■■■ Lennar alleges that American Dynasty made misrepresentations during the underwriting process by failing to inform Lennar that it did not intend to insure Lennar for EIFS claims. Lennar cites two letters written by Karen Ralston, the American Dynasty underwriter for the Lennar policy. During the underwriting process, Ralston communicated with Mary Pulley, an employee of the "wholesale broker." Pulley, in turn, communicated with the "retail broker." Therefore, the "retail broker" communicated with Lennar. Ralston sent a "quotation letter" and a "binder letter" to Pulley. In the letters, Ralston did not affirmatively state that American Dynasty *would* insure EIFS claims. However, Ralston did not state that American Dynasty *would not* insure EIFS claims. Lennar argues that Ralston's failure to state that EIFS claims would not be covered was, in effect, a misrepresentation that EIFS claims would be covered. We disagree.

The letters do not constitute misrepresentations by omission. In the letters, Ralston outlined the conditions under which American Dynasty would bind the policy. Lennar emphasizes that none of these conditions mention EIFS. However, Ralston did not purport to set forth the conditions under which claims would be covered once the policy was issued. Rather, Ralston set forth five conditions under which American Dynasty would bind the

policy in the first place.[60] Therefore, in outlining these conditions, Ralston did not misrepresent that EIFS claims would be covered. We cannot read the letters as misrepresentations merely because Ralston did not set forth every possible type of claim that might not be covered under the policy.

■■■ Lennar also asserts that American Dynasty's failure to include an EIFS exclusion in the policy amounted to a misrepresentation that EIFS claims would be covered. However, as we have discussed, American Dynasty relies on several portions of the policy to dispute coverage even though the policy does not contain an EIFS exclusion. Therefore, the absence of an EIFS exclusion is not a representation that the policy would cover EIFS claims. Accordingly, Lennar has failed to present any evidence of misrepresentations during the underwriting process.

## 2. Misrepresentations Concerning Termination and Rescission

■■■ Lennar also contends that American Dynasty made misrepresentations concerning its reasons for terminating, and seeking to rescind, the policy. Ralston first learned on March 10, 2000 that Lennar was requesting coverage for EIFS claims. Three days later, American Dynasty decided to terminate the policy. On May 12, 2000, Ralston wrote to Lennar explaining American Dynasty's reasons for terminating the policy:

> During the underwriting process ..., Lennar Corp. represented that it had not used [EIFS] in its home building projects and had no plans for use of EIFS in future projects.... Subsequent

**60.** Ralston stated that binding the policy was subject to American Dynasty's receipt of (1) a completed application, (2) Lennar's financial data, (3) a letter from Lennar confirming an approved claims service, (4) "currently valued loss data", and (5) a schedule of all named insureds to be covered.

to the issuance of the subject policy, American Dynasty learned that Lennar Corp. was, in fact, using EIFS applications in one or more of its Texas projects. If true facts had been disclosed to American Dynasty During [sic] the underwriting process, American Dynasty would not have issued the policy, would not have issued the policy at the same premium rate, and/or would not have provided coverage with respect to EIFS applications. For these reasons, the subject policy was canceled.... Moreover, because American Dynasty learned subsequent to the issuance of the policy that Lennar Corp.'s representation concerning past and future used [sic] of EIFS appellations was untrue, the risk covered by the policy has substantially changed. This substantial change in risk constituted a separate reason for cancellation.

The termination was prospective only. However, an American Dynasty claims representative subsequently decided to seek rescission of the policy *ab initio* for the same reasons. American Dynasty filed suit against Lennar in Florida seeking to rescind the policy. In the petition,

American Dynasty alleged "Lennar Corp., through its insurance broker, represented to American Dynasty in April 1999 that Lennar Corp. and its affiliates and subsidiaries had never used [EIFS] in its homebuilding projects. (That representation proved to be false)." [61]

In short, when terminating, and seeking to rescind, the policy, American Dynasty accused Lennar of making untrue statements regarding its use of EIFS. Lennar contends that American Dynasty's accusations were misrepresentations because Lennar did not make such statements. Lennar presented more than a scintilla of evidence that it did not make such statements, at least with respect to all Lennar entities at issue.[62] Accordingly, there is a genuine issue of material fact on whether American Dynasty made false representations by accusing Lennar of making untrue statements regarding its use of EIFS.

In spite of this fact issue, Lennar still cannot prevail on this claim because it presented no evidence that it suffered any pecuniary loss by relying on American Dynasty's representations as required to sustain a cause of action for common-law negligent misrepresentation.[63] *See Roof Sys.,*

---

61. The Florida suit was abated due to this Texas suit; American Dynasty's rescission counterclaim is still pending in this suit because the trial court severed it.

62. According to Ralston, before binding the policy, she specifically asked Pulley whether Lennar used EIFS, and Pulley responded that Lennar did not use EIFS. However, Pulley averred by affidavit that she had no recollection of Ralston asking her whether Lennar used EIFS. Nonetheless, even if they did discuss EIFS, Ralston did not know whether Pulley had spoken with Lennar concerning EIFS exposure; Ralston assumed that Pulley had spoken with the "retail broker." Ralston could not identify what untrue statements Lennar made regarding its use of EIFS, but "there somewhere was a misrepresentation." Further, according to Ralston, most of the time, she and Pulley spoke about "Lennar

Corporation" only, as opposed to Lennar's subsidiaries. Ralston also decided Lennar made untrue statements regarding its use of EIFS based on an "Underwriting Risk Analysis" performed several months after the policy's effective date. The analysis reflected that "Lennar Corporation" reported no past use of EIFS and no future plans to use EIFS. However, the analysis also stated that Lennar's numerous acquisitions of builders over the previous years made accurate assessment of EIFS exposure unlikely, and the acquired builders may present greater exposure to EIFS losses. Ralston did not follow up possible EIFS exposure for Lennar subsidiaries.

63. Further, the alleged misrepresentation regarding rescission of the policy was not made for the guidance of Lennar in its business as required to sustain a negligent misrepresenta-

*Inc.*, 130 S.W.3d at 438. American Dynasty relied on its own impression that Lennar had made false statements regarding its use of EIFS when deciding to terminate and rescind the policy. However, American Dynasty made the alleged misrepresentations *after* deciding to terminate and rescind the policy when explaining its reasons for doing so. Although Lennar claims it was damaged by American Dynasty's terminating, and seeking to rescind, the policy, Lennar presented no evidence it was damaged by relying on American Dynasty's alleged misrepresentations.[64] *Cf. MCN Energy Enters., Inc. v. Omagro de Colombia, L.D.C.*, 98 S.W.3d 766, 771–72 (Tex.App.-Fort Worth 2003, pet. denied) (holding manufacturing company proved pecuniary loss as a result of reliance on investor's misrepresentation that it would join company in operating plant because company spent millions developing the plant in response). Therefore, Lennar failed to present evidence to support all elements of its common-law

tion claim. *See Roof Sys., Inc.*, 130 S.W.3d at 438. Instead, it was merely an allegation in a suit. Regardless, Lennar did not prove that it suffered any pecuniary loss as a result of relying on the alleged misrepresentation. *See id.*

**64.** Lennar contends it was damaged by American Dynasty's terminating the policy because it had to replace the policy with another policy. Lennar contends it was damaged by American Dynasty's attempted rescission because it incurred legal expenses to avoid rescission and a gap in coverage and conducted business with uncertainty over whether it would have liability coverage for that policy period. Therefore, Lennar is, in effect, complaining of damages caused by the actual termination, and attempted rescission, as opposed to damages caused by any misrepresentations regarding the reasons for termination and attempted rescission. We will address Lennar's complaints regarding the actual termination and attempted rescission when we address its article 21.21 claims.

negligent misrepresentation claim. Consequently, the trial court properly granted summary judgment for American Dynasty on this claim.

**B. TEXAS INSURANCE CODE ARTICLE 21.21**

Lennar has asserted a cause of action under former article 21.21 of the Texas Insurance Code.[65] Section 3 of former article 21.21 prohibits an insurer from engaging in any trade practice which is defined in article 21.21 to be "an unfair or deceptive act or practice in the business of insurance."[66] Section 4 of former article 21.21 lists the acts which constitute "unfair and deceptive acts or practices in the business of insurance."[67] Section 16(a) of former article 21.21 also incorporates the "deceptive acts or practices" enumerated in section 17.46(b) of the DTPA.[68] An insured who has sustained actual damages as a result of an unfair or deceptive act or practice enumerated in section 4 of article 21.21, or in section 17.46(b) of the DTPA, may maintain an action. *See* TEX. INS.CODE ANN. art. 21.21, § 16(a).

**65.** Article 21.21 was repealed and recodified effective April 1, 2005. After we formally cite each section of former article 21.21 relevant to this opinion, we will then, for ease of reference, refer to the sections as they were previously codified in article 21.21.

**66.** Act of April 25, 1957, 55th Leg., R.S., ch. 198, § 1, 1957 Tex. Gen. Laws 401, 401–06 (repealed and recodified 2003) (current version at TEX. INS.CODE ANN. § 541.003 (Vernon Supp.2005)).

**67.** Act of May 10, 2001, 77th Leg., R.S., ch. 290, § 1, 2001 Tex. Gen. Laws 548, 548–551 (repealed and recodified 2003) (current version at TEX. INS.CODE ANN. §§ 541.051–.061 (Vernon Supp.2005)).

**68.** Act of May 17, 1995, 74th Leg., R.S., ch. 414, § 13, 1995 Tex. Gen. Laws 2988, 3000–001 (repealed and recodified 2003) (current version at TEX. INS.CODE ANN. § 541.151 (Vernon Supp.2005)); *see* TEX. BUS. & COM.CODE ANN. § 17.46(b) (Vernon Supp.2005).

Lennar contends that American Dynasty violated sections 4(1), 4(10)(i), 4(10)(viii), and 4(11) of article 21.21, and sections 17.46(b)(5) and 17.46(b)(12) of the DTPA. American Dynasty also moved for summary judgment as to these claims on no-evidence grounds. In response, Lennar contends the following conduct supports these claims: (1) American Dynasty's alleged misrepresentations during the underwriting process; (2) American Dynasty's alleged misrepresentations concerning termination and rescission; and (3) American Dynasty's alleged failure to conduct an adequate investigation before terminating, and seeking to rescind, the policy.[69]

**1. Misrepresentations During the Underwriting Process (Sections 4(1), 4(11), 17.46(b)(5) and 17.46(b)(12))**

Apparently, Lennar cites American Dynasty's alleged misrepresentations during the underwriting process to support its claims under sections 4(1) and 4(11) of article 21.21 and sections 17.46(b)(5) and 17.46(b)(12) of the DTPA, as incorporated in article 21.21. All of these sections prohibit some type of a misrepresentation regarding the policy or its provisions. *See* TEX. INS.CODE ANN. art. 21.21, § 4(1) ("misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby"); TEX. INS. CODE ANN. art. 21.21, § 4(11) ("[m]isrepresenting an insurance policy"); TEX. BUS. & COM.CODE ANN. § 17.46(b)(5) (representing goods or services have "characteristics" or "benefits" which they do not have); TEX. BUS. & COM.CODE ANN. § 17.46(b)(12) ("representing that an agreement confers or involves rights, remedies, or obligations which it does not have or involve").

Lennar has presented no evidence American Dynasty made any misrepresentations regarding the policy or its provisions. Specifically, we have already determined that American Dynasty did not make any misrepresentations during the underwriting process by failing to inform Lennar that the policy would not cover EIFS claims. In the absence of some specific misrepresentation by the insurer about the insurance, an insured's mistaken belief about the scope or availability of coverage is not generally actionable under the Insurance Code or the DTPA. *Moore v. Whitney–Vaky Ins. Agency,* 966 S.W.2d 690, 692–93 (Tex.App.-San Antonio 1998, no pet.) (holding insurance agent's failure to tell insured that liability policy did not cover employee retaliatory discharge claims was not actionable under Insurance Code or DTPA where insured admitted that agent never told him the policy would cover all lawsuits); *see United Servs. Auto. Ass'n v. Lambert,* No. 03–97–00811–CV, 1999 WL 695704, *7–8 (Tex.App.-Austin Aug.26, 1999, no pet.) (not designated for publication) (holding that insurer's failure to inform insured that policy would not cover testing for plumbing problems, after insured told insurer it planned to obtain the testing, was not actionable misrepresentation); *cf. State Farm Fire & Cas. Co. v. Gros,* 818 S.W.2d 908, 912–13 (Tex. App.-Austin 1991, no writ) (finding agent's representation to insured homeowner that damage would be covered if boulders, which fell into their driveway, had hit their home supported claims under article 21.21 and DTPA, when boulders subsequently did hit their home, but coverage was denied).

Therefore, Lennar has presented no evidence to support its claims under sections

---

**69.** Lennar does not specify which particular conduct supports which particular section. However, we have tried to match the particular lar alleged conduct with the particular section.

4(1) and 4(11) of article 21.21, and sections 17.46(b)(5) and 17.46(b)(12) of the DTPA, as incorporated in article 21.21. Accordingly, the trial court properly granted summary judgment for American Dynasty on these claims.

## 2. Misrepresentations Concerning Termination and Rescission (Section 4(10)(i))

■ Lennar also contends that American Dynasty's alleged misrepresentations concerning its reasons for terminating, and seeking to rescind, the policy violated section 4(10) of article 21.21. Section 4(10) prohibits "unfair settlement practices with respect to a claim by an insured" and enumerates the actions which constitute "unfair settlement practices." TEX. INS. CODE ANN. art. 21.21, § 4(10). Apparently, Lennar cites American Dynasty's alleged misrepresentations to support its claim under section 4(10)(i). Section 4(10)(i) prohibits an insurer from "misrepresenting to a claimant a material fact or policy provision relating to coverage at issue." *Id.* § 4(10)(i).

However, American Dynasty's representations did not concern coverage for the EIFS claims. Rather, the representations concerned American Dynasty's reasons for terminating, and seeking to rescind, the policy in general. We do not read section 4(10)(i) as encompassing misrepresentations concerning termination, or rescission, of a policy in general. *See id.* Further, even if section 4(10)(i) did encompass American Dynasty's representations concerning termination and rescission, again, Lennar presented no evidence that it suffered any damages as a result of the representations.[70] Therefore, Lennar failed to present evidence to support all elements of its section 4(10)(i) claim. Consequently, the trial court properly granted summary judgment on this claim.

## 3. Termination and Attempted Rescission (Section 4(10)(viii))

■ Lennar apparently complains of the actual termination and attempted rescission to support a claim under section 4(10)(viii). Section 4(10)(viii) prohibits an insurer from "refusing to pay a claim without conducting a reasonable investigation with respect to the claim." TEX. INS.CODE ANN. art. 21.21, § 4(10)(viii). Lennar argues that American Dynasty did not reasonably investigate whether Lennar actually made untrue statements regarding its use of EIFS before deciding to terminate and rescind the policy.[71]

■ However, section 4(10)(viii) focuses on an insurer's refusal to pay a particular claim without conducting a reasonable investigation. *See id.* Section 4(10)(viii) does not prohibit, or even mention, an insurer's terminating, or rescinding, a policy without conducting a reasonable investigation. *See id.* Nevertheless, Lennar cites *Union Bankers Insurance Co. v. Shelton,* in which the Texas Supreme Court held that an insured has a bad faith cause of action when an insurer cancels a policy without a reasonable basis, and the

---

**70.** Unlike a common-law misrepresentation claim, an insured is not required to prove reliance to maintain a claim under section 4 of article 21.21. *See* TEX. INS.CODE ANN. art. 21.21, § 16(a). However, the insured must prove that it sustained actual damages. *See id.*

**71.** Ralston did not follow up on her earlier conversation with Pulley or the "underwriting risk analysis" when deciding to terminate the policy. Nevertheless, she thought she had enough information to terminate the policy based on Lennar's alleged untrue statements regarding its use of EIFS. Further, the claims representative who decided to rescind the policy did not conduct his own investigation; instead, he relied on the information provided to him by Ralston.

insurer knew or should have known of that fact. 889 S.W.2d 278, 283 (Tex.1994). Lennar argues that this rule should apply equally to article 21.21 claims. We disagree.

While wrongful termination may be actionable in common-law bad faith, article 21.21, section 4 is an exclusive list of statutory "unfair or deceptive acts or practices" actionable under article 21.21. *See* TEX. INS.CODE ANN. art. 21.21, §§ 4, 16; *Tri–Legends Corp. v. Ticor Title Ins. Co. of California,* 889 S.W.2d 432, 440 ([Tex. App.-Houston 14th Dist.] 1994, writ denied) (citing *Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 147 (Tex.1994)). Article 21.21, section 4, and particularly section 4(10)(viii), does not include terminating, or rescinding, a policy without conducting a reasonable investigation as actionable conduct. *See* TEX. INS.CODE ANN. art. 21.21, § 4.[72] Because the Legislature and Texas Supreme Court have not made wrongful termination or rescission of a policy actionable under article 21.21, we decline to do so now.[73] Therefore, Lennar failed to present evidence to support its section 4(10)(viii) claim, and the trial court properly granted summary judgment on this claim.

### C. TEXAS INSURANCE CODE ARTICLE 21.55

█ Finally, American Dynasty moved for summary judgment on traditional grounds as to Lennar's cause of action under former article 21.55 of the Texas Insurance Code.[74] Article 21.55 imposes requirements on an insurer with respect to responding to claims, accepting or rejecting claims, and promptly paying accepted claims. TEX. INS.CODE ANN. art. 21.55, §§ 2, 3, 4. Article 21.55 prescribes penalties for an insurer's non-compliance. *Id.* § 6. Article 21.55 defines a "claim" as "a *first party claim* made by an insured or a policyholder under an insurance policy . . . that must be paid by the insurer directly to the insured." *Id.* § 1(3) (emphasis added).

Lennar asserts that American Dynasty's failure to timely indemnify Lennar for the EIFS claims violated article 21.55. American Dynasty contends that Lennar has no article 21.55 cause of action as a matter of law because the EIFS claims are third-party claims—not first-party claims.

Article 21.55 does not define "first party claim." *See id.* § 1. However, several courts have recognized that a first-party claim is one in which an insured seeks recovery for the insured's own loss. *See Hartman v. St. Paul Fire and Marine Ins. Co.,* 55 F.Supp.2d 600, 603 (N.D.Tex. 1998); *Universe Life Ins. Co. v. Giles,* 950 S.W.2d 48, 53 n. 2 (Tex.1997). The classic

---

**72.** Further, although article 21.21 incorporates section 17.46 of the DTPA, article 21.21 makes actionable only those deceptive acts and practices specifically defined in section 17.46. *See Tri–Legends,* 889 S.W.2d at 441 (citing *Watson,* 876 S.W.2d at 149). Wrongful termination or rescission are not defined as deceptive acts or practices in any of the subsections of section 17.46 cited by Lennar. *See* TEX. BUS. & COM.CODE ANN. §§ 17.46(b)(5) and (12).

**73.** Moreover, the issue of whether American Dynasty had a reasonable basis to rescind the policy is premature because the trial court severed American Dynasty's rescission counterclaim from this action pending resolution of this appeal. This issue will be more appropriately resolved in the rescission counterclaim. Nonetheless, American Dynasty's conduct with respect to attempted rescission does not support an article 21.21 claim.

**74.** Act of May 27, 1991, 72nd Leg., R.S., ch. 242, § 11.03, 1991 Tex. Gen. Laws 939, 1043–1045 (repealed and recodified 2003) (current version at TEX. INS.CODE ANN. §§ 542.051–.061 (Vernon Supp.2005)). Article 21.55 was also repealed and recodified effective April 1, 2005. We will hereafter refer to the pertinent sections as they were previously codified in article 21.55.

example of first-party insurance is property insurance. *Hartman,* 55 F.Supp.2d at 603 (citing Eric Mills Holmes & Mark S. Rhodes, Holmes' APPLEMAN ON INSURANCE 2d § 3.2 (1st ed.1996)). The insurance proceeds are paid by the first-party insurer directly to the insured to redress the insured's actual, direct loss. *See id.* (citing Holmes, § 3.2); *see also* BLACK'S LAW DICTIONARY 804 (7th ed.1999) (defining "first-party insurance" as "a policy that applies to oneself or one's own property, such as life insurance, health insurance, disability insurance, and fire insurance.").

In contrast, a third-party claim is one in which an insured seeks coverage for injuries to a third party. *See Hartman,* 55 F.Supp.2d at 603 (citing Holmes, § 3.3); *Giles,* 950 S.W.2d at 53 n. 2. If the third party reduces its claim to a judgment or settlement, the insured will suffer a loss. *Hartman,* 55 F.Supp.2d at 603 (citing Holmes, § 3.3). However, the insured's loss is "indirect," and the third party's loss is "direct." *Id.* (citing Holmes, § 3.3). The liability insurer reimburses its insured for the insured's indirect loss, but payment in practical effect runs directly to the third-party claimant. *Id.* (citing Holmes, § 3.3).

American Dynasty argues that based on these definitions, claims under a liability policy are third-party claims—not first party claims. In response, Lennar notes that several courts have held that a claim under a liability policy may be a first-party claim. However, these cases involve an insured's request for a defense under a liability policy. *See, e.g., Rx.Com, Inc. v. Hartford Fire Ins. Co.,* 364 F.Supp.2d 609, 611–20 (S.D.Tex.2005) (holding insured's request for a defense from liability insurer was first-party claim for purposes of article 21.55 and citing numerous federal courts applying Texas law that have held the same); *N. County Mut. Ins. Co. v.*

*Davalos,* 84 S.W.3d 314, 319 (Tex.App.-Corpus Christi 2002), *rev'd on other grounds,* 140 S.W.3d 685 (Tex.2004) (applying article 21.55 to insured's claim against liability insurer for failure to defend). In fact, the courts in this state disagree over whether an insured's request for a defense under a liability policy can be a first-party claim for purposes of article 21.55. *Compare, e.g., Rx.Com, Inc.,* 364 F.Supp.2d at 611–20; *Davalos,* 84 S.W.3d at 319; *with TIG Ins. Co. v. Dallas Basketball, Ltd.,* 129 S.W.3d 232, 239–42 (Tex. App.-Dallas 2004, pet. denied) (holding insureds' claim against liability insurer for reimbursement of defense costs after insurer refused to defend underlying action was not first-party claim). The Texas Supreme Court recently accepted a certified question from the Fifth Circuit on this issue. *See Lamar Homes,* 428 F.3d 193. However, resolution of this issue is irrelevant to our analysis.

■ We conclude that even if a request for a defense can be a first-party claim for purposes of article 21.55, Lennar's request for indemnification for the EIFS claims is a third-party claim. Courts holding that a request for a defense is a first-party claim recognize that the insured is seeking defense costs, which are paid either to, or for the benefit of, the insured. *See Rx.Com, Inc.,* 364 F.Supp.2d at 616–18. Thus, the insured seeks payment for its own loss although the underlying claim was brought by a third-party. *See id.* Consequently, although liability policies are termed "third-party" policies, the duty to defend is a form of first-party insurance contained within the liability policy. *See id.*

In contrast, Lennar's article 21.55 claim is based on a request for indemnification—not a request for a defense. Lennar does not seek payment for direct losses that it

suffered.[75] Rather, Lennar seeks indemnification for the damages it paid to the homeowners. Therefore, it seeks payment for direct losses suffered by third-parties. *See Hartman,* 55 F.Supp.2d at 603;[76] *Giles,* 950 S.W.2d at 53 n. 2.

Nonetheless, Lennar characterizes its request for indemnification as a first-party claim because the policy proceeds will be paid directly to Lennar. Lennar suggests that article 21.55 defines a first-party claim as one in which the proceeds will be paid directly to the insured. However, Lennar incorrectly reads article 21.55. Article 21.55 has two separate requirements for its application: the claim is a first party claim *and* the policy proceeds are paid directly to the insured. *See* TEX. INS.CODE ANN. art. 21.55, § 1(3).

If coverage exists under the American Dynasty policy, the proceeds will be paid to Lennar only because it settled the EIFS claims before seeking indemnification from American Dynasty. American Dynasty will still, in effect, be paying for direct losses suffered by third-parties. Therefore, we reject Lennar's reasoning that the EIFS claims were transformed from third-party claims into first-party claims merely by Lennar's paying the claims before seeking indemnification from American Dynasty. Consequently, the trial court properly granted summary judgment on Lennar's article 21.55 claim.

In sum, the trial court properly granted summary judgment in favor of American Dynasty on all Lennar's extra-contractual claims.

## XI. CONCLUSION

We overrule Lennar's first issue and affirm the denial of Lennar's motion for summary judgment as to all carriers.

We sustain, in part, and overrule, in part, Lennar's second issue. Specifically, we affirm the summary judgments in favor of Gerling, RLI, ICSOP, and Westchester. We reverse the summary judgment in favor of American Dynasty/Great American on coverage issues and remand for further proceedings consistent with this opinion. We reverse the summary judgment in favor of Markel and remand for further proceedings consistent with this opinion.

We overrule Lennar's third issue and affirm the summary judgment in favor of American Dynasty/Great American on Lennar's extra-contractual claims.

EDELMAN, J., concurs and dissents with opinion.

---

**75.** As we have discussed, Lennar did seek indemnification for its own overhead costs, inspection costs, personnel costs, and attorneys' fees in addition to the costs to repair the EIFS homes. However, we have already concluded American Dynasty has no duty to indemnify Lennar for these costs. Therefore, even if these costs could constitute a first-party claim, Lennar has no article 21.55 claim with respect to these costs. *See Allstate Ins. Co. v. Bonner,* 51 S.W.3d 289, 291 (Tex. 2001) (stating that to successfully maintain a cause of action for penalties under article 21.55, the insured must establish, among other elements, that the insurer is liable for the claim).

**76.** We note the *Hartman* court indicated that a request for a defense was not a first-party claim. *See* 55 F.Supp.2d at 603–04. However, the judge who wrote *Hartman* subsequently concluded in another case that a request for a defense can be a first-party claim. *See Travelers Indem. Co. of Connecticut v. Presbyterian Healthcare Res.,* 313 F.Supp.2d 648, 653 (N.D.Tex.2004). Regardless, we find the portion of *Hartman* distinguishing a first-party claim from a third-party claim is still viable although the judge later decided that a request for a defense comes within the definition of a first-party claim.

RICHARD H. EDELMAN, Justice, substituted concurring and dissenting.

My concerns with the majority's 72-page opinion in this case mostly relate to the following three aspects. First, if the costs for preventive replacement of EIFS, overhead, inspection, personnel, and attorney's fees are not property damage within the meaning of the policies, as the majority holds, then the summary judgments should have been partially affirmed as to the claims for those costs against American Dynasty / Great American and Markel (as well as the other insurers).

Second, despite purporting to deny Lennar's motion for summary judgment as to all carriers, the majority opinion nevertheless unequivocally holds, based on the uncontroverted evidence, that "Lennar's defective construction constitutes an 'occurrence' in this case"; "Lennar's defective construction constitutes an 'occurrence' under Texas law"; and "Lennar has established an 'occurrence' under all the policies." If this was a ground on which Lennar sought summary judgment, then the majority's conclusion dictates that summary judgment be partially rendered for Lennar on that ground. On the other hand, if the lack of an occurrence was merely a ground on which the insurers sought summary judgment, then our opinion should go no farther than to state that the insurers' summary judgment materials failed to establish this ground as a matter of law, Lennar's evidence was sufficient to raise a fact issue, or the like, as the case may be.

Third, I disagree with the reasoning of the majority opinion in interpreting the term "occurrence" in the policies. As rele-vant to this appeal, "occurrence" is defined to mean accident, which is not defined in the policies. An injury is accidental if, from the viewpoint of the insured,[1] it is not the natural and probable consequence of the action or occurrence that produced the injury; or, in other words, the injury could not reasonably be anticipated by the insured or would not ordinarily follow from the action or occurrence which caused the injury. *Mid–Century Ins. Co. of Tex. v. Lindsey*, 997 S.W.2d 153, 155 (Tex.1999).

An injury caused by voluntary and intentional conduct is not an accident just because the result or injury may have been unexpected, unforeseen, or unintended. *Id.* On the other hand, the mere fact that an actor intended to engage in the conduct that gave rise to the injury does not mean that the injury was not accidental. *Id.* Rather, both the actor's intent and the reasonably foreseeable effect of his conduct bear on the determination of whether an occurrence is accidental. *Id.* An event is, thus, accidental if its effect: (1) cannot reasonably be anticipated from the use of the means that produced it; and (2) is one that the actor did not intend to produce and cannot be charged with the design of producing. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 827 (Tex.1997).

As examples, "accident" has been held to include: (1) an employer's alleged negligent hiring, training, and supervision of an employee whose intentional conduct (assault) caused the injury;[2] (2) an unintentional discharge of a gun resulting from an attempt to gain entry to a truck by reaching through its rear window;[3] (3) a hunt-

---

1. Where the insured is not the actor who actually caused the injury, the actor's intent is not imputed to the insured to determine whether there was an occurrence. *See King*

*v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 190–92 (Tex.2002).

2. *See King*, 85 S.W.3d at 193.

3. *Lindsey*, 997 S.W.2d at 155.

er's deliberate firing of a gun at what he believed to be a deer, but was actually a person;[4] and (4) a deliberate application of a pesticide to rice in a rice mill.[5] Conversely, "accident" has been held not to include: (1) the copying of revealing photos of a person and showing them to others;[6] or (2) the removal of over 5000 cubic yards of borrow material (dirt) from a property pursuant to an agreement with a party who was later determined to be only a tenant in possession rather than an owner of the property.[7]

In this case, the trapping of water by EIFS is accidental if that effect: (1) could not reasonably be anticipated from the use of the product; and (2) is one that Lennar did not intend to produce and cannot be charged with the design of producing. *See Cowan*, 945 S.W.2d at 827. However, the majority opinion has instead framed the controlling issue as whether defective construction resulting in damage to the insured's own work can be an occurrence (accident). After discussing (for 20 pages) that the accident framework established by the Texas Supreme Court does not eliminate coverage for damage to the insured's own work, and that business risk exclusions would be rendered superfluous if such damage was not an occurrence, the majority concludes that Lennar has established an "occurrence" under all the policies because "the uncontroverted evidence demonstrates Lennar did not intend to build the homes with a defective product and did not intend or expect the resulting damage."

On the contrary, framing the controlling issue as merely whether defective construction resulting in damage to the insured's own work can be an accident only begs the question because, under the Texas Supreme Court's standards (outlined above), it unquestionably *can* be an accident, but depends entirely on other circumstances. Similarly, the fact that the "accident framework" established by the Texas Supreme Court does not eliminate coverage for damage to the insured's own work is of no consequence because that consideration is not even remotely a part of that framework.

Likewise, if framed broadly enough, any category of subject matter can potentially be covered by some policy exclusion and, under the majority rationale, thereby fall within the scope of the insuring agreement. Therefore, the fact that defective construction resulting in damage to an insured's own work could come within a business risk exclusion provides no guidance whether the water entrapment in this case was an accident.

Lastly, the fact that Lennar did not intend to use a defective product or expect the resulting damage does not alone establish an accident at all, let alone do so as a matter of law (if affirmatively *establishing* an accident is even an issue that is properly before us, as noted above). Instead, additional evidence (than is recited in the majority opinion) would be needed about the properties of EIFS and Lennar's decision to use it in the manner that it did to determine whether its water-trapping effect: (1) could not reasonably be anticipat-

---

4. *Cowan*, 945 S.W.2d at 828.

5. *See Mass. Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 400–01 (Tex. 1967); *see also Orkin Exterminating Co. v. Gulf Coast Rice Mills*, 362 S.W.2d 159, 161–62 (Tex.Civ.App.Houston 1962, writ ref'd n.r.e.).

6. *Cowan*, 945 S.W.2d at 828.

7. *See Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633, 635 (Tex.1973).

ed from the use of the means that produced it; and (2) is one that Lennar not only did not intend to produce, but also cannot be charged with the design of producing. *See Cowan,* 945 S.W.2d at 827.